**2021 WI App 24**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2019AP2350-CR

†Petition for Review Filed

Complete Title of Case:

**STATE OF WISCONSIN,**

 **PLAINTIFF-RESPONDENT,**

 **V.**

**MARKELL HOGAN,**

 **DEFENDANT-APPELLANT.†**

| | |
|---|---|
| Opinion Filed: | March 24, 2021 |
| Submitted on Briefs: | October 27, 2020 |

| | |
|---|---|
| JUDGES: | Neubauer, C.J., Reilly, P.J., and Davis, J. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Frederick A. Bechtold* of Taylors Falls, Minnesota. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Timothy M. Barber*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

# COURT OF APPEALS
# DECISION
# DATED AND FILED

## March 24, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.   **2019AP2350-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. **2015CF494**

**IN COURT OF APPEALS**

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

MARKELL HOGAN,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Sheboygan County: REBECCA L. PERSICK, Judge. *Affirmed.*

Before Neubauer, C.J., Reilly, P.J., and Davis, J.

¶1    DAVIS, J.   Ten years ago, our legislature amended the Wisconsin Rules of Evidence to align with well-established federal standards governing the admissibility of expert testimony. With a simple addition to WIS. STAT. § 907.02(1)

(2017-18),[1] the legislature adopted the ***Daubert***[2] reliability test and created a more rigorous "gatekeeping" role for trial courts. Whereas before, courts were required to admit expert testimony so long as it was relevant and the witness qualified, the statute now requires an additional, more rigorous, showing: the reasoning or methodology underlying the testimony must be reliable and reliably applied to the facts of the case.

¶2      This appeal requires us to apply that standard to the testimony of an expert who is qualified by experience and training (as opposed to formal education) in an emerging branch of criminology. A jury found Markell Hogan guilty of human trafficking. *See* WIS. STAT. § 940.302(1)(d), (2)(a) (as relevant here, it is a felony to use force, threats, fraud, or coercion to knowingly recruit, transport, or provide an individual for the purposes of a commercial sex act). His conviction followed a trial in which an expert testified about trends in human trafficking, including the methods and characteristics of traffickers and the common characteristics of their victims. Such testimony has become prevalent in human trafficking prosecutions, but no reported Wisconsin decision has addressed its admissibility. We do so here. We hold that the type of "specialized knowledge" at issue in this case may form the basis for expert testimony and that the trial court did not err in finding this expert's testimony reliable. *See* WIS. STAT. § 907.02(1). Accordingly, we affirm.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version.

[2] ***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579 (1993).

2

## BACKGROUND

¶3      A 2015 criminal complaint charged Hogan, as a repeater, with human trafficking; trafficking of a child, party to the crime; and strangulation and suffocation. *See* WIS. STAT. §§ 940.302(2)(a), 948.051(1), 940.235(1). The charges were primarily based on statements "Cathy" and "Mary"[3] made to police. Cathy, then fourteen years old, told police that she was walking down the street in Sheboygan when a "suspicious" white Cadillac pulled up next to her. The occupants, later identified as Mary and Hogan, tried to convince Cathy to get in the car with them. Cathy told police that "she had a feeling inside of her that the two individuals were going to try to traffic her"—that is, try to force her to perform sexual acts.

¶4      When police first spoke with Mary, by telephone, she took sole responsibility for the incident with Cathy. According to Mary, she was in an argument with Hogan, her boyfriend, and Hogan told her "that she was not his girlfriend." Mary "responded by saying that if she was not his girlfriend, she would find him one and ultimately called out of the car window to the young girl."

¶5      A week later, Sheboygan Police Department Detective Tamara Remington interviewed Mary in person, and Mary's story started to change. Remington saw bruises on Mary's arms and legs, a bruise on her back, and a scab on her forehead; Mary said that Hogan caused the injuries. She explained that she had met Hogan about two months earlier and that Hogan had started beating her a month after that. Mary said that Hogan was "very controlling" and that "she wanted to get away from him." She also stated that one time Hogan bent her neck so that

---

[3] In accordance with WIS. STAT. RULE 809.86, we refer to the victims by pseudonyms so as to protect their privacy.

3

she could not breathe; she "indicated that the incident occurred because she tried to get away." Mary told Remington that "Hogan wanted $2500.00 from her before she left because he knew he could get money because she was so beautiful and that people would pay" to have sex with her.

¶6 In a follow-up interview, Mary said that just prior to the incident with Cathy, Hogan took her to a party to meet the owner of the white Cadillac. Hogan took Mary there "specifically to offer her out for sex" with the Cadillac's owner, although they ended up not having sex. Mary explained that, on other occasions, Hogan drove her to houses to have intercourse with men, but she did not know how much she was paid for the sex acts because the customers always paid Hogan. While Mary was having sex with these clients, Hogan would wait outside the door.

¶7 Contrary to her prior statements, Mary further explained that she did not approach Cathy voluntarily but rather did so because Hogan told her to "get that bitch." According to Mary, Hogan said of Cathy, "[S]he'll be my bitch, she'll get me money," and, "She'll do what I say, 'cause if she don't I'll fuck her up." Hogan also told Mary that he would "bust … in [her] shit … right now" if she did not try to recruit Cathy. As Mary described it, Hogan wanted her to "get me a girl," but since she did not have any female friends, she "saw the first woman on the street and indicated she would get that girl." Mary stated that "she felt she had to approach" Cathy because otherwise she would have to prostitute herself.

¶8 Based on these statements and corroborating evidence, Hogan was arrested and charged with various crimes, including human trafficking; he pled not guilty and a trial date was set. Remington was expected to testify as one of the detectives in the case, but the State also moved to admit her expert testimony on the general "methods employed by people engaged in human trafficking or trafficking

4

a child." Prior to trial, the court held a ***Daubert*** hearing to assess Remington's qualifications and the reliability and relevancy of her proffered testimony. *See **State v. Jones***, 2018 WI 44, ¶¶29-32, 381 Wis. 2d 284, 911 N.W.2d 97; WIS. STAT. § 907.02(1).

¶9 At the ***Daubert*** hearing, Remington explained that she began her career in 1995 as a police officer in San Jose, California. She worked there for over ten years, including as a gang detective, and during that time participated in her first human trafficking operation. It was not until Remington moved to Sheboygan in 2005 and became a "school resource officer," however, "that the students there opened [her] eyes about human trafficking." In 2013, she began attending Wisconsin Department of Justice (DOJ) and other trainings on human trafficking. At her first conference, she met people from "agencies[, including] … the FBI [Federal Bureau of Investigation] and Milwaukee [Police Department]," and they invited her to join the Eastern Wisconsin Federal Human Trafficking Taskforce.

¶10 Thus, since 2013, Remington has been part of a human trafficking task force consisting of state law enforcement representatives from southeastern Wisconsin; representatives from federal agencies, such as the FBI and the Department of Homeland Security (DHS); and assistant United States attorneys. The task force meets every two to three months. During the first portion of each meeting, the group hears from individuals and community organizations, such as "nonprofits, [the] Convergence Resource Center … and citizens who work with human trafficking … survivors." The second portion is "law enforcement only" and is devoted to "a roundtable discussing our cases, because many of them, since this is a very mobile crime … overlap, so we're able to exchange information, discuss cases, discuss some of the trends, debriefings." Remington explained that because "[i]t's a big task force," the group is able to review "a large number" of cases.

¶11     In addition to her work with the task force, Remington continued to attend formal trainings on human trafficking, which covered topics like how to investigate trafficking and how to help survivors. In 2014, Remington herself began leading human trafficking trainings. According to her curriculum vitae, Remington has been an instructor or panelist on this topic over a hundred times, both locally and nationally; she presents mainly to law enforcement officials but also to community groups and agencies, such as the Wisconsin Department of Children and Families (DCF). In 2016, Remington also joined a DCF work group to develop a Wisconsin-specific "indicator tool" for teachers, parents, and others to identify children at high risk of being trafficked. That tool was released in 2017.

¶12     Remington testified that her experience with human trafficking has not been confined to meetings and training sessions but includes work with over eighty victims and approximately twenty suspected traffickers. She worked on additional trafficking investigations that began in her department before being turned over to federal or other state authorities. Remington further testified that she volunteers "[a] lot" at support groups for trafficking survivors run by the Convergence Resource Center, a community organization, and in this way has met "numerous survivors" of human trafficking. Finally, Remington reads relevant publications on human trafficking, including annual United States DOJ reports to Congress and information and articles published by DHS.

¶13     Remington next discussed her proposed testimony in this case. She testified that there are "some trends or commonalities" among trafficking victims and "some consistent behaviors" of traffickers. In an overview of her proffered trial testimony, Remington explained that "victims are vulnerable, high-risk individuals"—for example, they are often "runaways, juveniles with adverse behavior," or addicted to drugs. Traffickers, on the other hand, are "master

manipulators" able to identify and exploit these vulnerabilities to recruit and retain victims. As an example, Remington noted a "trend that had just come to our awareness in our task force [which] was that traffickers are starting to try to impregnate their victims … to have more control over the victims, because once you have a baby with someone, you really have more control [over] that person." Remington further noted that traffickers will often research a potential victim online, with "almost 80 percent of the meetings happen[ing] via social media." She explained that trafficking does not always involve force or threats of force, and at least at first, "often … start[s] off as a grooming, almost [like] a fake love." A trafficker or pimp can begin by "showering" the victim with "false love, and then it could turn; now you're going to have to [prostitute yourself]." Remington identified two main types of pimps: the "finesse" or "Romeo" pimp that acts in a more superficially loving manner and "the gorilla pimp" that operates mainly through force and brutality.

¶14 Remington explained that the aforementioned United States DOJ and DHS publications discussed these same trends and that she was unaware of any publications that disagreed. She testified that these trends were recognized and "generally accepted" within the law enforcement community. On cross-examination, Remington admitted that she had "[n]ot yet" "published any articles or books on this subject," but that she had been asked to do so.

¶15 The trial court ruled that Remington would be permitted to testify as an expert on human trafficking. The court noted that "the *Daubert* court referred to scientific testimony because that was the nature of the expertise in that particular case" but that "there have been a lot of cases since then that have expanded on what it means to be qualified as an expert." The court recognized that *Daubert*'s factors for assessing the reliability of scientific testimony were less applicable in the present

7

case, given the "inherent limitations of social science research, which is what we're dealing with in this case in terms of human trafficking." In the trial court's view,

> that means that other indicia of reliability are considered under ***Daubert***[,] including professional experience, education, training, and observations. And I think that's really what applies in this particular case. I think [the] Wisconsin Supreme Court in ***Seifert***[4] also agreed that experience-based evidence can surpass the ***Daubert*** reliability requirement.

The court then detailed the various bases for Remington's expertise (as discussed above), placing particular importance on the fact that "it's not just her own cases … she's had contact with perpetrators and victims from other cases to gain insight into what's going on." The court acknowledged that Remington had not published any articles but did not find that fact "particularly persuasive … because the nature of human trafficking is always changing. By the time the article is published, it may not even be relevant anymore." After further determining that Remington's testimony would be relevant, the court granted the State's motion to admit her expert testimony.

¶16    At trial, Remington testified in more detail on the characteristics of trafficking victims and the methods of traffickers, so as to provide context for why an individual might feel pressured, coerced, or brainwashed by a trafficker into prostituting him- or herself. This portion of Remington's testimony was general; she did not draw any conclusions regarding Hogan.

¶17    The jury found Hogan guilty of human trafficking of Mary; not guilty of trafficking of a child, party to a crime, as to Cathy; and not guilty of strangulation and suffocation of Mary. The court sentenced Hogan to twenty years' initial

---

4 ***Seifert v. Balink***, 2017 WI 2, 372 Wis. 2d 525, 888 N.W.2d 816.

8

confinement and ten years' extended supervision. The sole issue on appeal is whether the trial court erred in admitting Remington's expert testimony.

## DISCUSSION

*Admissibility Standards for Expert Testimony*

¶18    WISCONSIN STAT. § 907.02(1), governing the admissibility of expert testimony, adopts the federal "reliability" standard developed in ***Daubert*** and its progeny and codified by Federal Rule of Evidence 702. ***Seifert v. Balink***, 2017 WI 2, ¶¶6, 51, 372 Wis. 2d 525, 888 N.W.2d 816[5]; *see **Daubert***, 509 U.S. 579, 592-95 (1993). As § 907.02 was amended in 2011 to reflect this standard, there is, to date, only a small body of interpretive Wisconsin authority. But because § 907.02(1) mirrors RULE 702, we may rely on federal cases and the Federal Rules of Evidence Advisory Committee Notes to Rule 702 "for guidance and assistance."[6] ***Seifert***, 372 Wis. 2d 525, ¶¶51, 55.

---

[5] We cite to ***Seifert*** heavily in this decision because of its thorough discussion of the ***Daubert*** standard both generally and as applied to nonscientific and/or experience-based expert testimony. ***Seifert*** is a plurality opinion with one justice joining the lead opinion and three justices concurring in two separate concurrences. "It is a general principle of appellate practice that a majority must have agreed on a particular point for it to be considered the opinion of the court." ***State v. Dowe***, 120 Wis. 2d 192, 194, 352 N.W.2d 660 (1984). Accordingly, we have identified areas of agreement among these three opinions, and these are reflected in our decision. Generally, these opinions agree on the appellate standard for reviewing the trial court's decision; that the Wisconsin legislature amended WIS. STAT. § 907.02 to adopt the ***Daubert*** standard; that persuasive authority, such as the Advisory Committee Notes to Rule 702, aids in interpreting 907.02(1); and that the test of reliability is flexible, with the original ***Daubert*** factors not necessarily applicable to nonscientific and/or experience-based testimony. *See **Seifert***, 372 Wis. 2d 525, ¶¶51, 55, 59-77, 88-92 (lead opinion); *id.*, ¶¶171, 178, 185-88 (Ziegler, J., concurring); *id.*, ¶¶193, 216-18, 223, 225-27 (Gableman, J., concurring). The preceding citation merely identifies where support may be found for the authors' respective positions and is not meant to indicate where the opinions fully, or exclusively, overlap with one another. All other citations to ***Seifert*** are to the lead opinion.

[6] Although we do not do so here, we may also rely on decisions from other states interpreting Rule 702 or an analogous state law. *See **Seifert***, 372 Wis. 2d 525, ¶55.

¶19    WISCONSIN STAT. § 907.02(1) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

Thus, embodied in § 907.02(1) are three threshold requirements for admitting expert witness testimony: the witness must be *qualified* ("a witness qualified as an expert by knowledge, skill, experience, training, or education"); the witness's testimony must be *relevant* ("[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"); and, per the 2011 amendment adopting the **Daubert** standard, the witness's testimony must be *reliable* ("if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case"). *See **Jones***, 381 Wis. 2d 284, ¶¶29-30; **Bayer v. Dobbins**, 2016 WI App 65, ¶20, 371 Wis. 2d 428, 885 N.W.2d 173.

¶20    In **Daubert**, the United States Supreme Court created a "gatekeeping role" for the trial court in assessing the reliability of scientific expert testimony. *See **Daubert***, 509 U.S. at 592-97. Prior to **Daubert**, there was significant confusion about the proper standard for admitting expert testimony, leading to "sharp divisions" among the lower courts. *Id.* at 585. Some courts followed a line of cases beginning with **Frye v. United States**, 293 F. 1013, 1014 (D.C. Cir. 1923), that based admissibility exclusively on whether the testimony was generally accepted as reliable in the relevant scientific community. **Daubert**, 509 U.S. at 584-86. Other

10

courts recognized that the codification of the Federal Rules of Evidence, which occurred post-*Frye* and included an express provision on the admissibility of expert testimony, had superseded *Frye*'s "general acceptance" test. *Daubert*, 509 U.S. at 585-87.

¶21 The *Daubert* court agreed with those courts finding *Frye*'s exclusive reliance on the testimony's "general acceptance" incompatible with the Federal Rules of Evidence. *See Daubert*, 509 U.S. at 587-89. The Court explained, however, that the displacement of the *Frye* test did not mean there were "no limits on the admissibility of purportedly scientific evidence." *Daubert*, 509 U.S. at 589. Rather, implicit in Rule 702 itself, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[7] *Daubert*, 509 U.S. at 589-90. Accordingly, the Court proposed a set of alternative criteria for assessing reliability. *Id.* at 592-94. In the scientific context, the Court found it useful to consider whether the scientific theory or technique on which the expert's conclusions were based was testable (and tested), whether it was subjected to peer review and publication, and whether it was generally accepted in the scientific community. *Id.* at 593-94. Furthermore, the Court held, the trial court should ordinarily consider "the known or potential rate of error" of the technique and "the existence and maintenance of standards controlling the technique's operation." *Id.* at 594. The Court emphasized, however, that "[t]he inquiry … is … a flexible one" and that no factor is determinative. *Id.* at 594 & n.12.

¶22 *Daubert* involved expertise of a scientific nature. Of course, Rule 702 goes beyond such expertise, as it expressly encompasses "technical" or "other

---

[7] Any doubt as to whether *Daubert* represented a fair articulation of Rule 702 was rendered moot when Congress amended that rule to expressly codify the *Daubert* reliability test. *See* FED. R. EVID. 702, Advisory Committee Notes to 2000 Amendments.

specialized knowledge." *See* FED. R. EVID. 702. Such nonscientific testimony was the subject of another U.S. Supreme Court decision, ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137 (1999). There the Court reiterated that "***Daubert***'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." ***Kumho Tire***, 526 U.S. 137 at 141. The Court further explained that the trial court has "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." ***Id.*** at 142 (emphasis omitted). After clarifying that the reliability standard applies to all, and not just scientific, expert testimony, the Court summarized "the objective of th[e] [gatekeeping] requirement" as follows: "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." ***Id.*** at 152.

¶23    While the U.S. Supreme Court and Congress were reshaping the admissibility of expert testimony at the federal level, Wisconsin followed a different path, retaining a highly liberal admissibility standard based only on whether the proposed expert was qualified and his or her testimony relevant. ***Jones***, 381 Wis. 2d 284, ¶6; *see, e.g.*, ***State v. Fischer***, 2010 WI 6, ¶¶7, 34, 322 Wis. 2d 265, 778 N.W.2d 629. That changed with our legislature's 2011 amendment to WIS. STAT. § 907.02, as discussed above, which mirrored post-***Daubert*** amendments to Rule 702 and brought the ***Daubert*** standard to Wisconsin. *See* ***State v. Dobbs***, 2020 WI 64, ¶34, 392 Wis. 2d 505, 945 N.W.2d 609. The reliability of expert testimony ceased being a question for the jury and became a gatekeeping assessment for the trial court. ***Jones***, 381 Wis. 2d 284, ¶¶6-7.

¶24    Against this backdrop, our supreme court in ***Seifert*** considered how to assess reliability outside the scientific context, the subject of expert knowledge

12

in that case being the standard of care for family practitioners practicing obstetrics. *Seifert*, 372 Wis. 2d 525, ¶5. The court relied heavily on *Kumho Tire* and also approved the Advisory Committee's additional five factors for broadly assessing reliability: (1) "Whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying'"; (2) "Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (3) "Whether the expert has adequately accounted for obvious alternative explanations"; (4) "Whether the expert 'is being as careful as he would be in his regular professional work outside his paid litigation consulting'"; and (5) "Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *Seifert*, 372 Wis. 2d 525, ¶63 (citation omitted). Although citing these factors, the court left little doubt that the reliability analysis is flexible, noting that "courts have not been constrained by the listed factors" given "the broad range of cases in which expert evidence arises." *Id.*, ¶64. Accordingly, "the trial court may consider some, all, or none of the factors listed to determine whether the expert evidence is reliable." *Id.*, ¶65.

¶25 Relying on *Kumho Tire*, *Seifert* further recognized that personal knowledge and experience may form the basis for expert testimony. *Seifert*, 372 Wis. 2d 525, ¶77 ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." (citation omitted)). To assess reliability in this context, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.*, ¶73 (citation omitted). The goal is to "ensur[e] that the courtroom door remains closed to junk science" and

other speculative and suspect disciplines; any expert opinion "deemed sufficiently reliable" may then be admitted and "submitted to the 'capabilities of the jury and of the adversary system generally.'" *Id.*, ¶63, 85-86 (citation omitted). Thus, "[i]nstead of exclusion, the appropriate means of attacking 'shaky but admissible' experience-based … testimony is by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof….'" *Id.*, ¶86 (second alteration in original; citation omitted).

¶26    In sum, WIS. STAT. § 907.02(1) requires the trial court to determine, by a preponderance of the evidence and according to whichever criteria it deems appropriate, that the proffered expert testimony is based on adequate facts and a sound methodology and is thus sufficiently reliable to go before a jury. *Dobbs*, 392 Wis. 2d 505, ¶43; *Jones*, 381 Wis. 2d 284, ¶¶31-32. We review that decision for an erroneous exercise of discretion, meaning we will uphold the trial court's ruling where it "consider[ed] the relevant facts, applie[d] the correct law, and articulate[d] a reasonable basis for its decision." *Jones*, 381 Wis. 2d 284, ¶27 (citation omitted). This standard is highly deferential:  we will search the record for reasons supporting the trial court's decision, and we will sustain a ruling even where we disagree with it, so long as appropriate discretion was exercised. *Id.*; *Dobbs*, 392 Wis. 2d 505, ¶48.

*The Trial Court Did Not Erroneously Exercise its Discretion in Admitting Remington's Expert Testimony*

¶27    Hogan does not directly challenge Remington's qualifications and does not contend that her testimony was irrelevant.[8]   Instead, Hogan's primary argument is that Remington's testimony was unreliable.  Before considering this point, however, we must address a threshold argument:  Hogan implies not just that Remington's testimony did not meet the ***Daubert*** standard but that the study of human trafficking cannot ever form the basis of expert testimony.  Hogan points out that "[t]he field of 'human trafficking' studies is one that appears to be unknown in the reported opinions of Wisconsin appellate courts" and that the trial court "never considered whether the testimony of such experts should be considered reliable"; he also implies that such study is "junk science and unsupported conjecture."  Essentially, Hogan appears to argue that "trends in human trafficking" is not a subject on which one can *be* an expert.

---

[8]  WISCONSIN STAT. § 907.02(1) permits an expert witness to give "exposition testimony on general principles without explicitly applying those principles to … the specific facts of the case."  ***State v. Dobbs***, 2020 WI 64, ¶42, 392 Wis. 2d 505, 945 N.W.2d 609.  Where, as here, the expert proffers exposition testimony, then the trial court's relevancy analysis must consider both "whether the testimony will address a subject matter on which the factfinder can be assisted by an expert" and "whether the testimony will 'fit' the facts of the case."  ***Id.***, ¶¶43-44 (citation omitted).  "Whether expert testimony 'fits' a case turns on whether it is 'sufficiently tied to the facts of the case' such that 'it will aid the jury in resolving a factual dispute.'"  ***Id.***, ¶44 (citation omitted).  ***Dobbs*** was decided after Hogan's ***Daubert*** hearing (and after briefing to this court was completed), but the "fitness" requirement was an implicit part of the relevancy analysis even before ***Dobbs***.  *See* ***Dobbs***, 392 Wis. 2d 505, ¶¶36-44.  Accordingly, the trial court determined that Remington's proffered testimony would "certainly" be "useful to the jury" in enabling it to understand "a lot of aspects about human trafficking including how sex traffickers lure people into sex trafficking by manipulating them and exploiting their vulnerabilities" (i.e., the testimony would help the jury decide whether Mary was being trafficked by Hogan, as opposed to prostituting herself voluntarily).  Hogan does not challenge this determination.

¶28    If this is, in fact, Hogan's argument, then it is without merit.  The record in this case unquestionably establishes that significant federal and state governmental resources are devoted to studying, monitoring, and analyzing trends in human trafficking.  There is no indication that the sociological examination of this criminal activity is a waste of time or "junk science."  And although Wisconsin courts have not analyzed a ***Daubert*** challenge on this particular set of facts, Hogan himself recognizes that a number of federal cases have considered the admission of expert testimony in human trafficking prosecutions.  Trial courts in these cases have or have not admitted (or upheld the admission of) such testimony, as the circumstances dictate, but we are unaware of any case holding that human trafficking is an unfit *subject* for expertise.[9]  Rather, testimony on trends in human trafficking is nothing more than a subset of the "modus operandus" type of experience-based testimony routinely admitted in federal prosecutions.  *See **United States v. Mejia-Luna***, 562 F.3d 1215, 1219 (9th Cir. 2009) ("The federal courts uniformly hold … that government agents or similar persons may testify as to general practices of criminals to establish the defendants' modus operandi." (citation omitted)).[10]

---

[9]  *See, e.g.*, ***United States v. Brooks***, 610 F.3d 1186, 1195-96 (9th Cir. 2010) (upholding admissibility of detective's expert testimony on business of prostitution and relationships between pimps and prostitutes); ***United States v. Anderson***, 560 F.3d 275, 281-82 (5th Cir. 2009) (upholding admissibility of testimony of director for center serving victims of sexual exploitation, regarding characteristics of teenage prostitutes and their pimps); ***United States v. Farrell***, 563 F.3d 364, 377-78 (8th Cir. 2009) (holding that portions of human trafficking expert's testimony invaded the fact-finding function of the jury); ***United States v. King***, 703 F. Supp. 2d 1063, 1067-77 (D. Haw. 2010) (admitting developmental pediatrician's expert testimony on pimping).

[10]  *See also, e.g.*, ***United States v. Long***, 328 F.3d 655, 665-68 (D.C. Cir. 2003) (upholding admissibility of expert testimony on characteristics and strategies of preferential sex offenders); ***United States v. Griffith***, 118 F.3d 318, 321 (5th Cir. 1997) (upholding admissibility of expert testimony on drug traffickers' jargon); ***United States v. DeLeon***, 423 F. Supp. 3d 1210, 1245 (D.N.M. 2019) (admitting generalized expert testimony on gangs' operation).

¶29    Thus, the only proper question on appeal is whether the trial court appropriately exercised its discretion in determining that *this* witness's testimony met the ***Daubert*** standard.   We conclude that it did.   The trial court rightly determined that ***Daubert***'s reliability factors often have little application to nonscientific, experience-based expert testimony.  This does not, again, mean that social science testimony is inherently unreliable, but only that other considerations must guide the reliability analysis.   Here, the trial court determined that Remington's "professional experience, education, training, and observations" were more meaningful indicators of reliability.  The court then discussed the particular reasons to credit Remington's testimony, including her work as a detective, the trainings she attended, and, importantly, her participation in the trafficking work group.  What the court found significant was that Remington was not just testifying about her own experience—the multiple, overlapping bases for her expertise meant that, as the court put it, she had a broader "insight into what's going on."

¶30    Hogan himself admits that the ***Daubert*** factors are "nonexclusive." Therefore, we will address no further his contention that Remington's testimony was unreliable because those factors did not apply—except to note that, generally speaking, a trial court should not waste its time discerning, say, the "known or potential rate of error" or the testability of a social scientist's methodology.  *See Daubert*, 509 U.S. at 593-94.  Particularly for those gaining hands-on expertise in sociology, criminology, and similar fields, the "methodology" underlying the expert's conclusions is part and parcel of the expert's qualifications, and may be nothing more than rigorous participation in all of the various activities, trainings, and experiences available to that individual.  Thus, Hogan is incorrect when he argues, for example, that Remington "offers no methodology or process" by which she has determined that traffickers are "master manipulators."   Remington's

"methodology" was working with numerous traffickers and victims as a detective, regularly discussing regional trafficking cases with her work group, reading publications on human trafficking, and volunteering with victims. From all these sources of experience, Remington was able to reach a generalized conclusion about common behavioral and personality traits of traffickers.

¶31 This is not to say that a trial court must just "tak[e] the expert's word for it" when it comes to assessing the reliability of experience-based and/or nonscientific testimony. *See Seifert*, 372 Wis. 2d 525, ¶74. Nothing in this opinion should be read as condoning so-called *ipse dixit* testimony from an expert. *See id.*, ¶75. Especially where an expert's conclusions are not measurable or testable in any traditional sense, however, we must defer to the trial court as to how best to assess reliability. *See id.*, ¶64. Here, Remington's conclusions were acquired through extensive training and varied experiences, and reflect a broad knowledge of the pimp/prostitute subculture and interpersonal dynamic. In light of her background, we cannot discern, and Hogan does not argue, why Remington lacked the proper foundation to provide experience-based expert testimony. Moreover, Remington testified that her conclusions were recognized as true in her field and discussed in relevant publications.

¶32 Switching gears, Hogan argues that even if the *Daubert* factors need not apply, *some* articulated factors must apply—but do not here. Specifically, Hogan references the Advisory Committee factors outlined in *Seifert* and discussed above. *See supra*, ¶24. There is, again, no basis for this assertion—as *Seifert* makes clear, "the trial court may consider some, all, *or none* of the factors listed to determine whether the expert evidence is reliable." *Seifert*, 372 Wis. 2d 525, ¶65 (emphasis added). In any case, we disagree with the substance of Hogan's argument—it is evident from Remington's testimony that she has devoted

significant time to studying trends in human trafficking and was not merely expressing a cursory opinion developed for the purpose of litigation. *See id.*, ¶63 (quoting Advisory Committee commentary to Rule 702). Nonetheless, it was for the trial court to determine whether and how any reliability factors applied.

¶33   Finally, Hogan argues that because Remington was "relying solely or primarily on experience," she was required to, but did not, "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for that opinion, and how that experience is reliably applied to the facts." *See Seifert*, 372 Wis. 2d 525, ¶73 (citation omitted). Remington indisputably provided a thorough overview of her experience and qualifications, so we understand Hogan to argue that Remington was required to link each specific conclusion (i.e., traffickers are "master manipulators") back to the experience informing that conclusion. This is not the law. Remington was simply required to detail how her training and experience led to her conclusions. Nothing in the statute or case law mandates the unwieldy necessity of an expert's explaining precisely which portions of his or her background generated each individual conclusion.[11]

¶34   Hogan deplores what he views as "unreliable evidence … routinely being admitted for the prosecution of criminal defendants." Whatever merit there is to this position generally, there is no merit to Hogan's challenge to the expert testimony in this case. Here, the trial court properly relied on *Daubert*, *Kumho Tire*, and *Seifert* and gave thorough consideration of all the indicia of the

---

[11] Of course, Remington may very well have been able to fully detail how her experience informed any given conclusion—but she was not asked to do so. Our decision merely concludes that, on this record, the State met the requirements of *Seifert*, 372 Wis. 2d 525, without eliciting this additional testimony. If Hogan believed that Remington's experience did not lead to, was not a sufficient basis for, or was not reliably applied so as to reach one or more conclusions, then he should have raised that issue on his cross-examination of Remington and in his briefing to the trial court.

testimony's reliability, including Remington's significant experience with traffickers and victims, her reviews of many other cases at task force meetings, and the fact that she was discussing conclusions "generally accepted" among law enforcement officials. Even if we were to give no deference at all to the trial court's ruling, we would have a difficult time imagining some other methodology for reaching reliable conclusions on trends in human trafficking. In cases such as these, experience is (nearly) everything. We affirm.

*By the Court.*—Judgment affirmed.