COURT OF APPEALS
DECISION
DATED AND FILED

February 8, 2023

Sheila T. Reiff
Clerk of Court of Appeals

NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    2021AP828-CR

STATE OF WISCONSIN

Cir. Ct. No.  2018CF333

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JACOB JP BANAS,

DEFENDANT-APPELLANT.

APPEAL from judgment of the circuit court for Ozaukee County: TODD K. MARTENS, Judge. *Affirmed*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Following a jury trial, Jacob JP Banas was convicted of administering a stupefying drug to Sarah[1] while she was a patron in his bar.  On appeal, Banas contends the circuit court erred by admitting expert testimony and other-acts evidence at trial.  We reject Banas's arguments and affirm.

## BACKGROUND

¶2      In 2014, Sarah reported to law enforcement that she believed Banas drugged her while she was a patron in his bar.  The complaint alleged, in part, that Banas provided Sarah with a shot of brown liquid.  After consuming the shot, Sarah became very ill, her ears started ringing, and she could not remember anything from that moment on.  Sarah provided law enforcement with a sample of her hair to test for drugs.  The State ultimately charged Banas with administering a stupefying drug to Sarah, pursuant to WIS. STAT. § 941.32.

¶3      Prior to trial, the State moved to introduce other-acts evidence.  The State argued the nature of the crime rendered Sarah incapable of accurately describing what happened.  The State offered that between 2007 and 2017, multiple women reported incidents substantially similar to Sarah's that occurred after Banas provided the women with a drink.  The State planned to introduce the testimony of the women as well as testimony from witnesses who could corroborate the accounts to help identify Banas as the source of the drugs, Banas's modus operandi, his plan,

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2019-20), we use a pseudonym when referring to the victim in this case.  We also use pseudonyms when referring to the victim's friend ("Alice") and the victim's husband ("David").  Finally, we use pseudonyms when referring to all the other-acts witnesses ("Amy D.," "Ashley K.," "Zoe," "Ian," "Megan," "Lynn R.," "Carly," "Jane," "Steve," "Ken," and "Lindsey H.").

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

intent, and opportunity. The State made an offer of proof as to each other-acts witness, detailing each witness's proposed testimony. Banas opposed the motion.

¶4      At the other-acts motion hearing, the circuit court observed the charge of administering a stupefying drug had three elements: (1) that Banas administered a substance to Sarah; (2) that "[t]he substance was poisonous, stupefying, overpowering, narcotic, or anesthetic"; and (3) that Banas "acted with the intent to facilitate the commission of a crime." *See* WIS JI-CRIMINAL 1352 (2008); *see also* WIS. STAT. § 941.32. Given the allegations in the complaint, the court believed the State could prove Sarah consumed a stupefying substance. However, the court recognized that, given the nature of the case, the State would need to rely on circumstantial evidence that Banas administered the stupefying substance to Sarah with intent to facilitate a crime. The court summarized the other-acts evidence as: each woman knew what it took for them to be intoxicated; each was with Banas on a certain date; Banas gave each a drink; each woman did not consume a lot of alcohol that date; each began to feel ill; each lost her memory; and each one engaged in acts that she would not normally engage in.

¶5      Under the three-part *Sullivan*[2] framework, the circuit court admitted most, but not all, of the State's proposed other-acts evidence. The court concluded the witnesses' testimony relating to whether Banas gave a stupefying substance to Sarah as well as their testimony relating to whether he did so with the intent to facilitate a crime were admissible to show Banas's modus operandi, identity, intent, and plan. Next, the court determined the proposed testimony was relevant and probative in nearness in time, place, circumstances, similarity of acts, and the distinct traits of the victims. Finally, the court concluded the probative value of the

---

[2] *State v. Sullivan*, 216 Wis. 2d 768, 576 N.W.2d 30 (1998).

3

evidence substantially outweighed the danger of unfair prejudice. The court engaged in an analysis for each proffered other-acts witness.

¶6     The State also notified Banas that, at trial, it planned to introduce expert testimony from Dr. Pascal Kintz, a forensic toxicologist, regarding hair analysis he conducted that found Sarah had consumed doxylamine and diphenhydramine. Doxylamine (a sleeping medication) and diphenhydramine (a motion-sickness medication) are found in over-the-counter medications. Both drugs are also used to treat allergies. Kintz would explain the impairing effects these drugs have on individuals. Additionally, Kintz performed a hair analysis on one of the other-acts witnesses, Zoe, and would testify Zoe consumed diphenhydramine. Banas moved to exclude Kintz's testimony, pursuant to WIS. STAT. § 907.02(1) and *Daubert*,[3] on the basis that his testimony was speculative and unreliable—Kintz could not say who gave the drugs to Sarah or Zoe, how much was given, or exactly when the drugs were given.

¶7     At the *Daubert* hearing, the circuit court observed Banas had no objection to Kintz's qualifications as a forensic toxicologist, the reliability of the analyses and methods used by Kintz, or the conclusions contained in Kintz's reports. The court reasoned Banas's objections went to the evidence's weight, not its admissibility, and Banas was free to explore the limitations of Kintz's opinions on cross-examination. The court denied Banas's motion.

¶8     At trial, following the testimony of an FBI analyst who testified the FBI currently does not offer a hair analysis for doxylamine and diphenhydramine because it has not yet validated a testing method, Banas renewed his *Daubert*

---

[3] *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).

4

motion. Banas argued that, because the FBI did not have a validated method, Kintz should be prohibited from testifying about his testing method. The circuit court denied Banas's renewed motion. It reasoned the mere fact the FBI did not have a validated testing method did not mean Kintz's method was invalid.

¶9     Sarah testified that on April 8, 2014, she went to dinner at the August Weber Haus in Cedarburg with her best friend Alice. During dinner, Banas, whom Sarah knew professionally, approached their table. Banas was drinking a vodka red bull and offered Sarah a sip when she told him it was her favorite drink. Sarah and Alice ordered two bottles of wine during dinner and a Baileys to share during dessert. During dessert, Banas approached their table with three shots of brown alcohol. Sarah drank the shot.

¶10     After the shot, Banas left. The women finished their dessert and split the bill. Sarah signed the check and then lost her memory. She remembers only short flashes the rest of the evening. The next morning, Sarah woke up with a bad headache and ringing in her ears. Sarah had been hungover before, but she had never felt as bad as she did after her night at the August Weber Haus. She did not remember taking any medicine that day, but she occasionally took Benadryl and DayQuil for allergies. Sarah had also tried NyQuil, Zyrtec, Sudafed, and Tylenol for her allergies. She had previously taken those medications with an alcoholic drink, but never felt the way she felt on April 8.

¶11     Alice testified she drank the same amount of alcohol as Sarah and felt unimpaired. Alice said that about forty-five minutes after they drank the shots from Banas, Sarah became very impaired. Alice took Sarah home.

¶12     Sarah's husband David testified he had seen his wife intoxicated many times, but he had never seen her in the state she was in when she came home from

the August Weber Haus. Sarah was almost unresponsive, and, when she did respond, her speech was very slurred, her eyes were closed, and she was not coherent. David believed Sarah could have been drugged. He considered saving Sarah's vomit in case it needed to be tested, but he did not do so.

¶13 Later that week, Sarah was at a work function and mentioned to a friend what had happened the night of April 8 at the August Weber Haus. After their conversation and some internet research, Sarah believed she had been drugged by Banas. She reported the incident to the police and provided a hair sample.

¶14 Doctor Pascal Kintz testified as an expert in forensic toxicology. He tested Sarah's hair sample for doxylamine and diphenhydramine. Both drugs can cause strong impairment. Kintz detected three different periods of exposure to those drugs, and one exposure, during April-May 2014, was for a significantly higher amount of doxylamine compared to the other two. Doxylamine is a sleeping medication, and the effects of doxylamine are amplified with alcohol. The medication takes effect within fifteen to twenty minutes.

¶15 Officer Will Kirk testified that, upon executing a search warrant of Banas's apartment, he discovered two empty packets of diphenhydramine as well as an empty bottle of diphenhydramine.

¶16 The State then called eleven other-acts witnesses who testified about seven different situations in which women had experiences similar to Sarah's. Amy D. testified that in 2009, she went to the August Weber Haus with some friends. Banas served her drinks, and then Amy lost her memory. She remembers being in Banas's apartment, but remembers no details from her time there. Amy woke up the next morning feeling sick and disoriented. She had never lost her

6

memory from alcohol, knew what a hangover felt like, and said this felt different than a hangover.

¶17    Ashley K. testified that on December 30, 2010, she went to the August Weber Haus, and Banas served her three glasses of wine. Banas then gave her a dirty martini before she left the bar. Ashley lost her memory after she crossed the street and arrived at another bar. The next thing she remembered was waking up naked in her bed. She felt sick, and it was not a hangover. Ashley knew what a hangover felt like from past experience. Ashley had missed calls from Banas, and Banas told Ashley they had "fooled around."

¶18    Zoe testified she worked with Banas at a restaurant in Florida. On June 24, 2017, Zoe went out with Banas, and he provided her with two or three drinks. Zoe left because she felt anxious, sweaty, and sick. Zoe explained it was not like any intoxication she had previously experienced. Zoe lost her memory after getting in her car. In the morning, Zoe still felt very hot and sick. Zoe had previously experienced a hangover, and this was not a hangover. Doctor Kintz analyzed Zoe's hair sample and found diphenhydramine in two different segments. Kintz explained diphenhydramine mixed with alcohol can cause strong impairment. Zoe testified she had not taken any sleep or allergy medication during this time period.

¶19    Zoe's boyfriend Ian testified Zoe's text messages from that night were initially normal, but then became incoherent, with spelling errors and sentences that did not make sense. When she got home, Ian recorded a video of Zoe because he had never seen Zoe act that way before. The video was played for the jury.

¶20    Megan worked at the August Weber Haus with Banas from 2012 to 2014. Banas would give her drinks, and on one or two occasions Megan lost her

memory and had a pounding headache the next morning. Megan testified she had experience drinking alcohol and had not drunk enough in either case to lose her memory or feel so awful. Additionally, while working at the August Weber Haus, Megan found loose pills. Banas told her that his wife, who was in medical school at the time, identified the pills as Advil. Banas kept a large bottle labeled as Advil behind the bar, but Megan never looked in the bottle.

¶21 Lynn R. testified that during the summer of 2008, she went to the August Weber Haus. Lynn drank a glass of wine or sangria at the bar and talked to Banas while he was the bartender. Lynn's friend arrived at the bar thirty to forty minutes later, and Lynn had two more glasses of wine or sangria before leaving the bar. Lynn remembered leaving and feeling like her legs were rubber. The next thing she remembered was waking up in the morning. She felt awful, and it was not a hangover.

¶22 Carly testified that in November 2008, she was out with her friends and ran into Banas at a bar a few doors down from the August Weber Haus. Banas had access to Carly's drinks. Carly estimated she had a couple of drinks, but she did not drink enough to become intoxicated. She knew what it felt like to be intoxicated. Banas invited the women to come to the August Weber Haus after closing. Carly went to the August Weber Haus with Banas and that was the last thing she remembered. In the morning, Carly felt foggy and different from any other morning after drinking.

¶23 Carly's friend Jane testified she was out with Carly on the night in November 2008. After Carly and Banas left, Jane tried to find Carly. Jane eventually got a text from either Carly or Banas that stated Carly was passed out. Carly's friend Steve testified he got a call from Carly's phone, but it was a man who

stated he was trying to figure out whose phone it was because there was a naked girl in his bed. Carly's father Ken testified he received a call from Carly's phone that Ken should come to pick Carly up because Carly was not well. When Ken arrived at Banas's apartment, Carly was incoherent, did not smell like alcohol, and was acting differently than she would act when she was intoxicated.

¶24     Lindsey H. testified she visited Cedarburg in November 2013 with some friends. Someone named "Jacob" approached Lindsey and her friends and offered to buy them a shot. Jacob left the bar, but he returned a short while later with shots. Jacob left when Lindsey's husband arrived. Lindsey could not identify Banas as the person who provided her with the shot. After drinking the shot, Lindsey became very emotional and lost her memory for the rest of the evening. Lindsey knew what it felt like to be intoxicated, but this did not feel like intoxication. Lindsey also knew what a hangover felt like, and this did not feel like a hangover.

¶25     Ultimately, the jury convicted Banas. He appeals.

## DISCUSSION

¶26     On appeal, Banas argues the circuit court erred by admitting Kintz's expert testimony and the other-acts evidence at trial. "The admission of evidence is subject to the circuit court's discretion," and "[w]e will not disturb the circuit court's decision to admit evidence unless the court erroneously exercised its discretion." *State v. Ringer*, 2010 WI 69, ¶24, 326 Wis. 2d 351, 785 N.W.2d 448. A court properly exercises its discretion when it "examine[s] the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Loy v. Bunderson*, 107 Wis. 2d 400, 415, 320 N.W.2d 175 (1982).

9

## I.    Kintz's expert testimony

¶27    A court's decision to admit or exclude expert testimony is governed by WIS. STAT. § 907.02(1). That subsection adopts the federal "reliability" standard developed in *Daubert*. *State v. Giese*, 2014 WI App 92, ¶17, 356 Wis. 2d 796, 854 N.W.2d 687. Under § 907.02(1), there are three "threshold requirements" for the admission of expert testimony:

> the witness must be *qualified* ("a witness qualified as an expert by knowledge, skill, experience, training, or education"); the witness's testimony must be *relevant* ("[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"); and … the witness's testimony must be *reliable* ("if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case").

*State v. Hogan*, 2021 WI App 24, ¶19, 397 Wis. 2d 171, 959 N.W.2d 658 (quoting § 907.02(1); first alteration in original).

¶28    Here, Banas concedes he "does not challenge Dr. K[intz]'s expertise, or the impact he has had on the field of forensic toxicology. The research Dr. K[intz] has conducted and taught the world is cutting edge, incredibly beneficial, and has frequently been substantiated in other laboratories." Rather, Banas challenges the relevancy and reliability of Kintz's testimony. He argues Kintz's testimony was irrelevant because Kintz could not say who gave the drugs to Sarah or Zoe, how much was given, or exactly when the drugs were given. He also argues Kintz's testing method was unreliable because the method has not yet been adopted by the FBI.

¶29     We agree with the circuit court that Banas's objections go to the evidence's weight, not its admissibility.  Kintz's testimony was relevant.  *See* WIS. STAT. § 904.01 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").  Here, the jury needed to determine whether Banas administered a stupefying drug to Sarah. *See* WIS. STAT. § 941.32; WIS JI-CRIMINAL 1352.  Kintz testified he analyzed Sarah's hair sample and found the presence of doxylamine and diphenhydramine. Both drugs can cause strong impairment, especially when combined with alcohol. Banas was able to effectively cross-examine Kintz on the limits of his opinions, including that Kintz could not tell exactly when the drugs were administered, how much was given, or who gave the drugs.

¶30     Kintz's testimony was based on a reliable foundation.  To determine whether evidence has a reliable foundation, courts look to "whether the scientific approach can be objectively tested, whether it has been subject to peer review and publication, and whether it is generally accepted in the scientific community." *Giese*, 356 Wis. 2d 796, ¶18.  "The goal is to prevent the jury from hearing conjecture dressed up in the guise of expert opinion." *Id.*, ¶19.  During trial, Banas objected to Kintz's testing method on the basis that the FBI did not offer a similar test.  However, different laboratories have different methods and tests, and those differences alone do not make the tests invalid.  Kintz testified his lab had a valid test for these drugs.  His testing methodology has also been published and peer reviewed.  We conclude the circuit court did not erroneously exercise its discretion in admitting Kintz's testimony.  *See* ***Ringer***, 326 Wis. 2d 351, ¶24.

## II.    Other-acts evidence

¶31    Banas next argues the circuit court erroneously admitted the other-acts evidence.[4]  Wisconsin courts use a three-step framework when determining the admissibility of other-acts evidence.  *See State v. Sullivan*, 216 Wis. 2d 768, 771-72, 576 N.W.2d 30 (1998).  First, the evidence must be offered for a permissible purpose under WIS. STAT. § 904.04(2)(a).  *Sullivan*, 216 Wis. 2d at 772.  Second, the evidence must be relevant under WIS. STAT. § 904.01.  *Sullivan*, 216 Wis. 2d at 772.  Third, the evidence's probative value must not be substantially outweighed by the danger of unfair prejudice.  *Id.* at 772-73; *see* WIS. STAT. § 904.03.  The proponent of the other-acts evidence must show the evidence is being offered for a permissible purpose and is relevant; the opponent then must prove the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.  *State v. Marinez*, 2011 WI 12, ¶18, 331 Wis. 2d 568, 797 N.W.2d 399.

¶32    As a threshold matter, Banas agrees that if we conclude Kintz's expert testimony was properly admitted, then Zoe's testimony was properly admitted as other-acts evidence.  Because we conclude Kintz's testimony was properly admitted, we accept Banas's concession regarding Zoe's testimony.

¶33    Next, we agree with the State that Amy's, Ashley's, Megan's, Lynn's, and Ian's testimony regarding their experiences satisfied all three prongs of the *Sullivan* test and were therefore properly admitted.  The four women testified they were with Banas on a certain date; Banas gave them a drink; after the drink, they

---

[4] Although the issue before us is whether the court erroneously exercised its discretion when deciding whether to admit the other-acts evidence based upon the offer of proof, the parties largely focus their briefing on the trial testimony.  Banas does not identify any objection he made at trial to the other-acts evidence on the basis that it differed from the offer of proof made by the State at the motion hearing.  In any event, we do not observe any material differences between the offer of proof made by the State and the other-acts witnesses' trial testimony.

lost their memory; they were very ill; they knew what it was like to be hungover, and this was different. Ian's testimony corroborated Zoe's testimony, who had the same experience as the other women, as well as offered further insight into Zoe's behaviors that night. The State offered this evidence for a permissible purpose because it provided evidence of Banas's modus operandi, identity, intent, and plan. *See* WIS. STAT. § 904.04(2)(a); *see also Sullivan*, 216 Wis. 2d at 772.

¶34 This evidence was also relevant to show Banas's modus operandi, identity, intent, and plan. *See Sullivan*, 216 Wis. 2d at 772. For the reasons explained above, we agree the evidence regarding these women's experiences "ma[d]e the existence of [a] fact that [was] of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* WIS. STAT. § 904.01; *see also Sullivan*, 216 Wis. 2d at 772.

¶35 Finally, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See Sullivan*, 216 Wis. 2d at 772-73. We agree with the State that this evidence is highly probative. Given the nature of the charged offense, evidence of Banas's modus operandi, plan, intent, and opportunity were necessary at trial. *See Marinez*, 331 Wis. 2d 568, ¶41 (explaining that circuit court should consider proponent's need to present evidence given the context of entire trial). "Prejudice is not based on simple harm to the opposing party's case, but rather 'whether the evidence tends to influence the outcome of the case by improper means.'" *Id.* (citation omitted). Here, the circuit court provided a cautionary jury instruction regarding the proper use of the other-acts evidence. "We presume that juries comply with properly given limiting and cautionary instructions, and thus consider this an effective means to reduce the risk of unfair prejudice to the party opposing admission of other acts evidence." *Id.* The court

did not err in admitting Amy's, Ashley's, Megan's, Lynn's, and Ian's testimony under WIS. STAT. § 904.04(2)(a) according to the *Sullivan* analysis.

¶36 The remaining other-acts evidence focuses on Carly's and Lindsey's experiences. Banas argues Carly's testimony, along with the testimony of Carly's witnesses (Jane, Ken, and Steve), should not have been admitted because Carly testified at trial that Banas only had access to her drinks, and she did not testify that Banas provided her with a drink.[5] Banas argues Lindsey's testimony was not relevant because Lindsey was unable to identify Banas at trial as the man who bought her a drink.

¶37 The State responds that Carly's testimony was substantially the same as the other women's. Banas was near Carly's drink, and then Carly lost her memory, even though she did not have enough alcohol to cause memory loss. The State contends Jane, Ken, and Steve all offered important missing facts to Carly's experience, including information corroborating her behavior and that Banas was with Carly before and after he had access to her drinks, providing circumstantial evidence that he in fact gave her a stupefying drug. The State asserts Lindsey's testimony was relevant, noting, although she could not identify Banas in the courtroom, she did identify the man who gave her the drink as "Jacob."

¶38 We observe that, "[a]lthough some other acts cases focus 'on the other incident's nearness in time, place and circumstances to the alleged crime or to the

---

[5] The State, in its offer of proof for the other-acts motion, stated that Carly would testify Banas gave her a drink. Banas never objected at trial on the basis that Carly's trial testimony differed from the State's offer of proof. However, because we conclude the admission of Carly's testimony was harmless, we do not address whether Banas preserved this objection to Carly's testimony for appeal. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (explaining that court of appeals decides cases on the narrowest possible grounds).

14

fact or proposition sought to be proved,' '[s]imilarity and nearness are not talismans. Sometimes dissimilar events will be relevant to one another.'" ***State v. Payano***, 2009 WI 86, ¶70, 320 Wis. 2d 348, 768 N.W.2d 832 (citations omitted). That Carly's and Lindsey's experiences were similar but not identical to Sarah's does not necessarily mean they were inadmissible. We see no material difference in Carly's trial testimony that Banas had access to her drinks, but did not directly serve her. In any event, even if Banas had renewed his other-acts objection at trial based on differences with the State's offer of proof, any error in the admission of this evidence was harmless. *See* WIS. STAT. § 901.03(1).

¶39    "Harmless error analysis requires us to look to the effect of the error on the jury's verdict." ***State v. Hunt***, 2014 WI 102, ¶26, 360 Wis. 2d 576, 851 N.W.2d 434. "For the error to be deemed harmless, the party that benefited from the error—here, the State—must prove 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" ***Id.*** (citation omitted). Our supreme court

> has previously articulated several [non-exhaustive] factors to assist in a harmless error analysis, including but not limited to: the importance of the erroneously admitted or excluded evidence; the presence or absence of evidence corroborating or contradicting the erroneously admitted or excluded evidence; the nature of the defense; the nature of the State's case; and the overall strength of the State's case.

*Id.*, ¶27.

¶40    Based on our review of these factors, we conclude that if there was an error in the admission of Carly's and Lindsey's experiences, the error was harmless. The evidence against Banas was overwhelming and established through Sarah's testimony, Kintz's testimony, and law enforcement testimony as well as the

experiences of Zoe, Amy, Ashley, Megan, and Lynn. Sarah testified she lost her memory and became very ill after Banas provided her a drink. Kintz found evidence of doxylamine and diphenhydramine in Sarah's hair, and both drugs can cause strong impairment when combined with alcohol. Police found multiple empty containers of diphenhydramine at Banas's residence. To prove Banas's modus operandi, his plan, intent, and opportunity, Zoe, Amy, Ashley, Megan, and Lynn testified that after Banas provided them a drink, they lost their memory, became ill, and engaged in acts they would not normally engage in. It is clear the outcome would have been the same had the jury not heard about Carly's and Lindsey's experiences. Therefore, even if the circuit court erred in admitting Carly's and Lindsey's other-acts evidence, the error was harmless. A rational jury would have found Banas guilty absent the error. *See id.*, ¶26.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.