**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**June 12, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2136-CR**

Cir. Ct. No. **2020CF104**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

PLAINTIFF-APPELLANT,

V.

DEREK J. JARVI,

DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Lafayette County: DUANE M. JORGENSON, Judge. *Affirmed and cause remanded*.

Before Graham, Nashold, and Taylor, JJ.

¶1 GRAHAM, J. The State appeals a circuit court order that granted Derek Jarvi a new trial after he was convicted of second-degree sexual assault of a

person under the influence of an intoxicant. *See* WIS. STAT. § 940.225(2)(cm).[1] The incident that led to Jarvi's conviction occurred during a camping trip, when Jarvi had sexual intercourse with "A.B."[2] The State alleged that A.B. was too intoxicated to have the capacity to consent to intercourse. Jarvi's defense was that A.B. did in fact consent, and that Jarvi did not know that she was too intoxicated to have the capacity to consent.

¶2 In his postconviction motion and on appeal, Jarvi argues that the circuit court erred when it prohibited him from testifying at trial to certain statements that A.B. purportedly made before, during, and after the alleged assault. We conclude that the statements were admissible, and that the court's erroneous evidentiary rulings were not harmless. Therefore, we affirm the circuit court order granting Jarvi's postconviction motion, and we remand for a new trial.

¶3 Jarvi's postconviction motion also raised additional issues that he renews on appeal. Among other things, he argues that the circuit court erroneously prohibited him from presenting expert testimony regarding alcohol-induced blackouts in light of A.B.'s representation that she was "blackout intoxicated" when the alleged assault occurred. We need not and do not resolve that issue because our conclusion regarding the evidence about A.B.'s statements

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86, we refer to the alleged victim and to her friend, who was a witness at trial, using initials that do not conform to their actual names.

is dispositive.  However, the expert testimony issue is likely to recur in a new trial, and we briefly address it to provide guidance for the proceedings on remand.[3]

## BACKGROUND

¶4      Jarvi, A.B., and "C.D." all worked at the same company, and the three became friends during the summer of 2020.

¶5      The alleged sexual assault occurred during a camping trip that Jarvi, A.B., and C.D. went on in the fall of 2020.  After arriving at their campsite in the early afternoon, they set up camp, went hiking, and later swam in the lake.  The three all consumed alcoholic beverages over the course of the day and into the evening, and each described himself or herself as having been "drunk" to varying degrees throughout the day and night in question.  At some point later in the evening, C.D. left the group to go to sleep, but A.B. and Jarvi stayed up by the campfire.  When A.B. awoke in her tent the following morning, her shirt was unbuttoned and she was not wearing any clothing below the waist.  A.B. did not remember how she got to the tent the night before, but wondered if something had happened.  Later that morning, Jarvi asked if she was "on birth control" because he "wasn't ready to be a father."

¶6      A.B. contacted the Lafayette County Sheriff's Department to report that Jarvi had sexually assaulted her.  Among other things, A.B. told Detective Jerrett Cook that Jarvi had intercourse with her when she was "blackout

---

[3] Jarvi also argues that his trial counsel was constitutionally ineffective for failing to object to various references to his pretrial silence.  We do not address this issue because our conclusion about the court's evidentiary rulings is dispositive, and issues about Jarvi's right to pretrial silence are less likely to recur in a new trial.

intoxicated," and that Jarvi knew that she did not want to have sexual relations with him.

¶7    Detective Cook contacted Jarvi about the allegations. Jarvi initially indicated that he would be willing to meet with Cook. However, after Jarvi retained an attorney, the attorney told Cook that Jarvi would not be speaking with law enforcement at that time.

¶8    The State filed a criminal complaint that charged Jarvi with second-degree sexual assault of an intoxicated person contrary to WIS. STAT. § 940.225(2)(cm). That statute provides that a defendant is guilty of a Class C felony if: (1) the defendant has "sexual contact or sexual intercourse with a person"; (2) the person is "under the influence of an intoxicant" at the time; (3) the person is "under the influence of an intoxicant to a degree which renders that person incapable of giving consent"; (4) the defendant "has actual knowledge that the person is incapable of giving consent"; and (5) the defendant "has the purpose to have sexual contact or sexual intercourse with the person while the person is incapable of giving consent." *See* § 940.225(2)(cm); *see also* WIS JI—CRIMINAL 1212 (identifying these five elements of a violation of § 940.225(2)(cm)).

¶9    Prior to the trial, Jarvi moved to admit the expert testimony of Dr. Kim Fromme, who is a professor emeritus of clinical psychology and has been researching "the effects of alcohol intoxication, including blackouts," for several decades. As discussed in greater detail below, Fromme would have testified about her research and expertise regarding alcohol-induced blackouts, including how a blackout affects a person's cognition, how it affects a person's ability to form memories, and how a person experiencing a blackout may appear to an observer,

including the observer's ability to perceive whether the other person was capable of making decisions. Fromme would have also testified that, in her opinion, A.B. experienced a blackout on the night of the camping trip, and Jarvi would not have known that A.B. was in a blackout state and would not have been able to ascertain her level of intoxication.

¶10 The circuit court held a ***Daubert*** hearing to assess the admissibility of the proffered testimony,[4] and at the close of the hearing, Jarvi argued that he had "a constitutional right" to present it. The court concluded that Fromme's testimony was inadmissible based on the criteria in WIS. STAT. § 907.02, and did not expressly consider Jarvi's argument that he had a constitutional right to present it.

¶11 The jury trial was held in October 2021. The State's case rested primarily on the testimony of A.B. and C.D., whose accounts were generally consistent with each other and went as follows. On the day of the camping trip, they arrived at the campsite in the afternoon and Jarvi made tequila drinks. A.B. and C.D. threw up shortly after consuming the tequila drinks, but they continued to drink various alcoholic beverages throughout the day, including tequila, beer, and hard seltzers. They also went on a hike.

¶12 At some point during the afternoon, Jarvi asked C.D. if she and A.B. would be interested in having a threesome. C.D. told Jarvi that A.B. would not be

---

[4] *See **Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579 (1993). A ***Daubert*** hearing is an evidentiary hearing in which the circuit court exercises its "gatekeeping role" and assesses whether an expert's qualifications and testimony comport with the standards in WIS. STAT. § 907.02(1). *See **State v. Hogan***, 2021 WI App 24, ¶¶19-20, 397 Wis. 2d 171, 959 N.W.2d 658.

5

interested, and A.B. also told Jarvi that she was not interested and was "loyal to the person" that she was dating.

¶13 Around sunset, the group went to the beach. They went swimming, which eventually turned into skinny dipping. That event was captured in photographs.

¶14 The group returned to their campsite, made dinner, and sat around the campfire. C.D. testified that, at some point in the evening, Jarvi and A.B. went on a walk by themselves, and that later, Jarvi kissed them both by the campfire and the subject of who was the better kisser was raised. C.D. testified that she retired to her hammock and went to sleep shortly thereafter, but that A.B. and Jarvi remained by the campfire.

¶15 C.D.'s testimony also included her observations of A.B. that night. Specifically, C.D. testified that, after dinner, A.B. was "a little bit more quiet and reserved," "a little bit less giggly," and "unsteady on her feet." According to C.D., A.B. needed help getting out of her chair and walking to the bathroom. Also, a short time after Jarvi and A.B. had left the campsite alone, C.D. heard A.B. calling her repeatedly. She went to find A.B. and Jarvi, and A.B. needed to be supported by C.D. and Jarvi in walking back to the campsite. And, when Jarvi kissed A.B. by the campfire, A.B. put her hands up in a defensive posture and got "really quiet" afterwards. On cross-examination, C.D. was asked if she shared this information with Detective Cook when he interviewed her. C.D. testified that she told Cook that she thought A.B. was "pretty intoxicated," but did not share the above details about A.B.'s demeanor, balance, or fall.

¶16 A.B. testified that she remembered some but not all of the events of the day and night in question, and that "there [were] blocks of time" where she had

no memory. Specifically, A.B. remembered arriving at the campsite and going on a hike. She remembered going swimming and taking photographs when skinny dipping, but she testified that she must have been "pretty drunk" at that time because she would not have allowed those photographs to be taken otherwise. She also remembered that C.D. helped her get to the bathroom, and that she fell down at some point and scraped her knee. She remembered that Jarvi kissed her at the campfire, and that she was "uncomfortable" and "shocked" when that happened. The last thing A.B. remembered before awaking the following morning was "eating chips and salsa" by the fire after C.D. went to bed. When questioned about other events that may have occurred on the camping trip, A.B. testified that she had no memory of those events. For instance, she did not remember returning to the campsite after going swimming, making dinner, or going on a walk alone with Jarvi. She did not remember how she got to her tent, and did not remember having sexual intercourse. When asked to explain her sporadic memory, she testified that she was "blackout drunk," and that "there's just chunks of the night that I don't remember."

¶17 Detective Cook also testified, and he described various parts of his investigation. Cook testified that A.B. told him that she was "blackout intoxicated," which Cook knew to be "a level of intoxication that is not normal for most people." He also testified that Jarvi declined to meet with him throughout the pendency of his investigation and was "uncooperative as far as wanting to interview."

¶18 Jarvi was the sole witness for the defense. His account of the camping trip was consistent with the accounts given by A.B. and C.D. in many ways, with the following key differences.

7

¶19    Jarvi did not recall a conversation about having a threesome, but he testified that he "wouldn't put it past [himself] to make a threesome joke on a camping trip with two females."

¶20    Jarvi confirmed that he and A.B. went on a walk by themselves later in the evening, and he provided additional testimony about what happened during the walk. Specifically, he testified that the walk took place at A.B.'s suggestion, that A.B. took him by the hand as they were walking, and that at one point, A.B. stopped, turned toward Jarvi, and kissed him. He testified that he was "[a] little" surprised that A.B. kissed him, but then again, they had been skinny dipping together "not an hour [before]." Jarvi thought that A.B. "wasn't really comfortable being physical in front of [C.D.]," but that she was more comfortable "when it was just me and [A.B.]" Jarvi attempted to testify in further detail about what happened after A.B. kissed him on the walk, but he was unable to elaborate because the State objected on hearsay grounds and the circuit court sustained the objection. At the postconviction hearing, Jarvi testified that, had he been allowed to continue, he would have testified that A.B. exclaimed, "I just kissed you!"; that they kissed again; that C.D. called out to them; and that A.B. said, "We should go back."

¶21    During his trial testimony, Jarvi also confirmed that he kissed both A.B. and C.D. by the campfire at some point after he and A.B. got back from their walk. According to Jarvi, A.B. said something to him and he leaned over and kissed her, which C.D. saw and then "exclaimed" something. (Jarvi was not able to testify what C.D. exclaimed because the circuit court sustained the prosecutor's hearsay objection.) Jarvi then kissed C.D. C.D. asked "who [was] a better kisser" and Jarvi said she was, but he then kissed A.B. again, which made C.D. "visibly upset" and "sort of … jealous."

¶22 Jarvi testified that C.D. went to bed shortly thereafter, leaving Jarvi and A.B. alone at the campfire. At the postconviction hearing, Jarvi testified that, but for the circuit court's evidentiary rulings and directions, he would have testified about a conversation between A.B. and C.D. that occurred when C.D. decided to go to bed. He testified that C.D. repeatedly told A.B. to go to bed—specifically, that A.B. responded that she was "not tired," that she was "fine," and that she "wanted to stay up by the fire."

¶23 At trial, Jarvi further testified that, at that point in the evening, A.B. seemed "happy," "full of energy," and "giggly," and at no point did he see A.B. stumbling, having a hard time getting in or out of her chair, or throwing up.

¶24 Jarvi then provided specific testimony about what happened immediately before, during, and after the alleged sexual assault. However, as discussed in greater detail both here and below, the prosecutor lodged frequent objections to the testimony on hearsay grounds, and the circuit court sustained most of the objections and twice instructed the jury to disregard portions of Jarvi's testimony.

¶25 Specifically, Jarvi testified that shortly after C.D. went to bed, A.B. stood up, took his hand, led him to her tent, squatted down to unzip her tent flap, looked back at Jarvi and smiled, and then got in her tent and held the flap open for Jarvi. They went into the tent and A.B. lay down and they started kissing. Jarvi asked A.B., "Are we doing this?" and A.B. replied "Yeah." At that point the prosecutor objected on hearsay grounds, and the circuit court sustained the objection, stating: "It is hearsay … and [the] jury should disregard it. It's stricken."

¶26 Jarvi then testified that A.B. helped him remove her underwear; that she was moaning pretty loudly, and that after some time, A.B. "took [his] penis and put it inside of her vagina" and they had intercourse. As Jarvi attempted to describe what happened when they were having intercourse, he testified that A.B. was "saying affirmations." The prosecutor again objected to the testimony as hearsay, and asked the circuit court to strike it and to instruct Jarvi "that he can't repeat things that [A.B.] said." The court sustained the objection, struck the testimony about A.B.'s "affirmations," directed Jarvi to limit his testimony, and instructed the jury to disregard certain aspects of Jarvi's prior testimony:

> THE COURT: … Mr. Jarvi, you can't testify as to what someone else said.
>
> THE WITNESS: Yes, Your Honor.
>
> THE COURT: Go ahead, [trial counsel]. And I would note that that reference [to A.B.'s "affirmations"] should be stricken from the record as well, and I'm going to direct as well that the jury disregard all the statements that Mr. Jarvi has made as to statements that both of the—that [A.B.] and [C.D.]—he indicates have been made. He can't testify as to hearsay, and it is all hearsay, other than what is already in the record prior to his testimony. So let's keep it clean.
>
> THE WITNESS: I'm trying to, Your Honor. I apologize.

¶27 Jarvi then testified about what happened after the alleged assault. He and A.B. fell asleep in her tent, and he eventually went to his own tent after he woke up and used the bathroom. Counsel then asked Jarvi about the conversation that he had with A.B. the following morning, but he instructed Jarvi to "stick to things that you [said], and not say anything that [A.B.] has told you." Jarvi testified that he asked A.B. about birth control.

¶28 A couple days after the camping trip was over, Jarvi learned that A.B. had expressed that she had been too intoxicated to consent to sexual

intercourse. Jarvi testified that he was "horrified," and that "[n]ever in my life have I ever wanted to have sex with someone who I thought was not able to consent to it." He further testified that he thought A.B. was "interested in [him]" based on "our chemistry, touching each other and horseplaying around, and then getting naked together, the way that she acted around me after we had been naked together, kissing me …. And then obviously when she brought me to her tent." However, Jarvi testified, "it wasn't until she took my penis and put it into her vagina that I was sure, you know, she was wanting to have sex with me." At no point did he think that A.B. "was too drunk to be able to engage in [intercourse]," and he would not have had intercourse with A.B. if he had thought that was the case.

¶29 In closing arguments, the prosecutor asked the jury to discredit Jarvi's testimony that he did not perceive A.B. to be so intoxicated that she lacked the capacity to consent. In so doing, the prosecutor urged the jury to credit the testimony from A.B. and C.D. regarding A.B.'s physical manifestations of impairment. The prosecutor also referenced A.B.'s testimony that she was "blackout drunk," and argued "[Jarvi's] telling us today that he didn't see any impairment by [A.B.], but she's telling us the complete opposite, that she was blackout drunk." And the prosecutor argued that Jarvi's account was less credible than the account given by A.B. and C.D. because Jarvi had been able to "sit here ahead of time and listen to their [testimony] and come up with answers," while A.B. and C.D. "had no idea what his story was until he said it today. They didn't get the opportunity to come up with an explanation."

¶30 The jury found Jarvi guilty, and Jarvi filed a motion for postconviction relief. He argued, among other things, that the circuit court erred by precluding him from testifying about A.B.'s alleged statements on hearsay

11

grounds; that the court erred when it determined that the expert witness testimony that he intended to present was inadmissible; and that his trial counsel was constitutionally ineffective for failing to object to evidence and arguments about his pretrial silence.

¶31 Following an evidentiary hearing at which Jarvi and his trial counsel both testified, the circuit court granted the motion for a new trial. In an oral ruling, the court explicitly rejected Jarvi's argument about the expert witness testimony. As for its exclusion of Jarvi's testimony about A.B.'s statements, the court determined that there was "error on [the court's] part" and the error was "not harmless." The court was also troubled by the prosecution's evidence and arguments about Jarvi's pretrial silence. "[I]n total," the court stated, when it took an "entire view of the … trial," "we can do better" and "it's important that a defendant … receive a clean trial." The State appeals.

## DISCUSSION

¶32 The State asks us to reverse the order that vacated Jarvi's judgment of conviction and granted a new trial. It acknowledges that the trial was not "error-free," but argues that none of the issues Jarvi raised in his postconviction motion should result in his conviction being vacated. Jarvi argues that we can and should affirm the circuit court's order on any of the three rationales that he presented to the circuit court. We begin our analysis with Jarvi's challenge to the court's evidentiary rulings about A.B.'s statements.

### I. A.B.'s Statements

¶33 As mentioned, Jarvi argues that the circuit court erred when it prevented him from testifying about several statements that A.B. purportedly made

before, during, and after the alleged assault. We first analyze the parties' arguments about the evidentiary errors, and we then consider the State's argument that any error was harmless.

### A. The Evidentiary Rulings

¶34 This court will not disturb a circuit court's decision to admit or exclude evidence unless the circuit court erroneously exercised its discretion. *State v. Ringer*, 2010 WI 69, ¶24, 326 Wis. 2d 351, 785 N.W.2d 448. "A circuit court erroneously exercises its discretion if it applies an improper legal standard or makes a decision not reasonably supported by the facts of record." *Weborg v. Jenny*, 2012 WI 67, ¶41, 341 Wis. 2d 668, 816 N.W.2d 191 (citations omitted).

¶35 Here, as noted, the circuit court sustained objections to Jarvi's testimony about several of A.B.'s alleged statements on hearsay grounds. It ordered that this testimony be stricken, instructed the jury to disregard the testimony, and directed Jarvi to "keep it clean." On appeal, Jarvi focuses his argument on the court's exclusion of the following statements:

- Statements that Jarvi says A.B. made when they were alone on the walk—specifically that, had Jarvi been allowed to continue his testimony, he would have testified that A.B. exclaimed, "I just kissed you!"; that they kissed again; and that after C.D. called out to them, A.B. said, "We should go back."

- Statements that Jarvi says A.B made when she took his hand and led him to her tent—specifically, that A.B. responded "Yeah" after Jarvi asked "Are we doing this?" As noted, the circuit court sustained the

objection to A.B.'s response, struck it from the record, and instructed the jury to "disregard it."

- Statements that Jarvi says A.B. made during intercourse. As noted, when Jarvi testified that A.B. was "saying affirmations," the circuit court sustained the objection, directed Jarvi that he could not "testify as to what someone else said," and instructed the jury to "disregard all the statements" that Jarvi had indicated that A.B. and C.D. made.[5]

¶36 Additionally, Jarvi contends that the circuit court's rulings and directions had a "chilling effect" on his trial testimony, which prevented him from testifying about other statements that A.B. and C.D. purportedly made, in addition to the statements that are recounted above. During the postconviction hearing, trial counsel testified that the instructions prevented him from pursuing lines of questioning about "specific interactions" that would have bolstered the defense, and Jarvi testified that the court's instructions prevented him from explaining some of the "context" that was relevant to his "state of mind." Among other things, Jarvi would have testified about a conversation between A.B. and C.D. when C.D. decided to go to bed—specifically, that C.D. repeatedly told A.B. to go to bed, and that A.B. responded that she was "not tired," that she was "fine," and that she "wanted to stay up by the fire." He also would have testified that A.B. took his hand and said, "Come on, let's go" before she led him to her tent, and that when he was initially unable to become erect, A.B. asked "What's wrong?"

---

[5] The circuit court also sustained hearsay objections to Jarvi's testimony about other statements that A.B. and C.D. purportedly made, and Jarvi challenged the court's ruling with respect to some of these statements in his postconviction motion. However, Jarvi does not renew his argument about some of these statements on appeal, and we limit our discussion to the statements addressed in his appellate briefing.

Finally, he would have testified that A.B. said "Yes," "Oh God," and "Yeah," when they were having intercourse, and "Wow" and "It's so hot" right after intercourse. The circuit court did not discredit Jarvi's postconviction testimony that he would have testified about these statements at trial if the court had not directed him to limit his testimony, and the State does not argue that we cannot consider these statements.

¶37 On appeal, the State tacitly concedes that none of the above statements are rendered inadmissible by the rules of hearsay, and we accept the concession. Given the State's concession, we conclude that the statements are not hearsay either because the statements would not have been offered for the truth of the matter asserted, *see* WIS. STAT. § 908.01(3), or because they would have fallen within a statutory exception to the hearsay rule, *see* WIS. STAT. § 908.03(1) (present sense impressions); § 908.03(2) (excited utterances); § 908.03(3) (then existing mental, emotional, or physical conditions). Thus, we conclude that the circuit court erroneously exercised its discretion when it limited Jarvi's testimony about the statements listed above on hearsay grounds.

¶38 The State nevertheless argues that we may affirm the evidentiary rulings that the circuit court made at trial on another ground. *See **Glendenning's Limestone & Ready-Mix Co., Inc. v. Reimer***, 2006 WI App 161, ¶14, 295 Wis. 2d 556, 721 N.W.2d 704 (providing that the court of appeals "may affirm the circuit court on an alternative ground"). Specifically, it argues that none of the above-listed statements were relevant, and therefore, that Jarvi's testimony about those statements was properly excluded.

¶39 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence." WIS. STAT. § 904.01. In other words, if evidence is "logically related to an element of the offense," then it is relevant. *See State v. Dorsey*, 2018 WI 10, ¶48, 379 Wis. 2d 386, 906 N.W.2d 158. Here, the State argues that Jarvi's testimony about statements that A.B. purportedly made had no "arguable bearing" on the disputed elements of the charged offense. More specifically, the State contends that Jarvi's testimony about the statements would not assist the jury in determining whether A.B. was "under the influence of an intoxicant to a degree which [rendered her] incapable of giving consent"; whether Jarvi had "actual knowledge" that A.B. was "incapable of giving consent"; or whether Jarvi had "the purpose" to have intercourse with A.B. while she was "incapable of giving consent." *See* WIS. STAT. § 940.225(2)(cm); *see also* WIS JI—CRIMINAL 1212 (setting forth the above-quoted jury instructions and defining "consent" as "words or actions by a person who is competent to give informed consent indicating a freely given agreement to have sexual intercourse").

¶40 For reasons we now explain, we disagree. We need not consider whether the excluded testimony was relevant to the jury's assessment of A.B.'s capacity to consent, because we conclude that the excluded testimony was relevant to the jury's assessment of Jarvi's actual knowledge and purpose.

¶41 We begin by considering the majority of the statements that Jarvi wanted to offer, which were purportedly made by A.B. immediately before, during, and right after the alleged assault. As mentioned, Jarvi wanted to testify that A.B. told C.D. that she was "fine," was "not tired," and did not want to go to bed; that A.B. said "Come on, let's go" as she led Jarvi to her tent; that A.B. said "Yeah" when Jarvi asked "Are we doing this?"; that A.B. asked Jarvi "What's

16

wrong?" when he could not become erect; and that A.B. made various enthusiastic exclamations during and after intercourse.

¶42 Contrary to the State's argument, A.B.'s purported statements are relevant to whether Jarvi had "actual knowledge" that A.B. was incapable of consenting. That element is subjective, *see* WIS JI—CRIMINAL 1212, cmt. 3, and the jury's assessment of Jarvi's actual knowledge would have taken into account all of Jarvi's testimony about how A.B. presented to him—her movements, her balance, and the way in which she was speaking, but also the words she used to express herself in those moments. Therefore, this testimony has at least some bearing on whether Jarvi knew that A.B.'s level of intoxication rendered her incapable of making an informed and freely given agreement to have sexual intercourse. WIS JI—CRIMINAL 1212. Here, we agree with the State that A.B.'s words were not dispositive on this element. That is, the jury could have determined that Jarvi actually knew that A.B. was not capable of consenting, even if the jury were to credit Jarvi's testimony that A.B. made all of these statements. However, it was up to the jury to decide what Jarvi actually knew, and the words A.B. used were one part of the overall picture and could have had some bearing on the jury's assessment. For similar reasons, the omitted testimony, if credited by the jury, could have affected the jury's assessment of whether Jarvi had "the purpose" to have intercourse with A.B. while she was incapable of consenting.

¶43 The State accurately points out that "[c]onsent is not an issue in alleged violations of" WIS. STAT. § 940.225(2)(cm). *See* § 940.225(4). From that, the State argues, "evidence of 'words and overt actions' … 'indicating a freely given agreement to have sexual intercourse' … are not relevant or admissible" because here, "[A.B.] could not freely consent based on her condition." (Citing § 940.225(4).) This argument misses the mark for two reasons.

¶44 First, the State's assertion that A.B. "could not freely consent based on her condition" assumes the truth of an element that the State had to prove beyond a reasonable doubt. In other words, the statute does not presume that, just because A.B. was intoxicated, she lacked the capacity to consent. Rather, it requires that the State prove that A.B. was "under the influence of an intoxicant to a degree" that "render[ed] her incapable of giving consent." WIS. STAT. § 940.225(2)(cm); *see also* **Commonweath v. Blache**, 880 N.E.2d 736, 742 (Mass. 2008) ("[T]here are many levels of intoxication, and the fact of intoxication, by itself, does not necessarily mean that the individual in question is incapable of deciding whether to assent to a sexual encounter.").

¶45 Second, although lack of consent is not an element of the charged offense, it does not follow that A.B.'s purported words are irrelevant to the determination of Jarvi's actual knowledge or purpose. Indeed, as the State acknowledges, a comment to the pattern jury instructions explains that, "[w]hile 'without consent' is not an element" of an alleged violation of WIS. STAT. § 940.225(4)(cm), "evidence relating to consent may be relevant to the elements that refer to the victim being incapable of giving consent." WIS JI— CRIMINAL 1212, cmt. 5. This of course includes the elements that required the jury to find that Jarvi had "actual knowledge" that A.B. was "incapable of giving consent" and that Jarvi had "the purpose" to have intercourse with A.B. while she was "incapable of giving consent."

¶46 The State also argues that the relevance of A.B.'s statements turned on how A.B. was speaking and otherwise acting, and not on any specific words she used. It therefore asserts that the circuit court did not err in limiting testimony about the content of A.B.'s speech because the court did not prevent counsel from asking Jarvi about how A.B. was speaking and otherwise acting. We agree that

A.B.'s conduct, including the manner of A.B.'s speech and whether she was speaking intelligibly or slurring her words, would surely be relevant to the jury's assessment. We further agree that, under certain circumstances, a jury might find testimony about how A.B. was acting and speaking to be as or more indicative of the disputed elements than what she actually said. However, this does not mean that what A.B. allegedly said was irrelevant. As noted, it was up to the jury to decide if Jarvi had actual knowledge that A.B. was incapable of giving consent and that his purpose was to have sexual intercourse with A.B. while she was incapable of giving consent. The words A.B. used were one part of the overall picture that could have had some bearing on the jury's assessment of these two elements. Therefore, we conclude that the statements A.B. purportedly made immediately before, during, and after the alleged assault were relevant.

¶47 We now turn to the remaining statements, which A.B. allegedly made earlier in the day when A.B. and Jarvi went for a walk and A.B. allegedly initiated a kiss. Again, as noted, Jarvi contends that he would have testified that, after A.B. kissed him, she said "I just kissed you!"; they kissed again; and A.B. said "We should go back" after C.D. called for them. The State argues that these statements are irrelevant because they were made well before the alleged assault, and are "not probative of whether [A.B.] was incapacitated" later that evening.

¶48 We agree that this testimony is not directly relevant to A.B.'s level of intoxication at the time of the assault. However, depending on the timing of these statements, which is unclear from the record, these statements could be at least marginally relevant to the issue of whether Jarvi had actual knowledge that A.B. was incapacitated. In other words, A.B.'s statements may have affected Jarvi's assessment concerning A.B.'s capacity to consent because these statements may have supported a belief that A.B. was aware of her circumstances and was

19

making voluntary decisions, including initiating a kiss and responding to C.D.'s call by saying that she and Jarvi should return to the campsite. And relatedly, these statements could be at least marginally relevant to Jarvi's "purpose." The probative value of this evidence may not have been strong, but we cannot say that it lacked "any tendency" to make "any fact" of consequence more or less probable, and was thus wholly irrelevant. *See* WIS. STAT. § 904.01.

¶49 For all these reasons, we conclude that the testimony that the circuit court excluded was relevant within the meaning of WIS. STAT. § 904.01, and was not inadmissible under the hearsay rules. Accordingly, the court erred when it ruled that this testimony was inadmissible, and further when it struck this testimony and instructed the jury to disregard it.

### B. Harmless Error

¶50 We now consider whether the circuit court's erroneous exercise of discretion warrants reversal. We will not reverse a conviction based on erroneous evidentiary rulings unless the errors affected the defendant's "substantial right." *State v. Hunt*, 2014 WI 102, ¶26, 360 Wis. 2d 576, 851 N.W.2d 434 (citation omitted); WIS. STAT. § 901.03(1). Under this rule, an error is harmless if the party that benefitted from the error (here, the State) proves "'beyond a reasonable doubt that the error … did not contribute to the verdict obtained,'" and that the jury "would have found the defendant guilty absent the error." *Hunt*, 360 Wis. 2d 576, ¶26 (citation omitted). That is, in the present case, the State has the burden to prove "not that the jury *could* have convicted [Jarvi] …, but rather that the jury *would* have arrived at the same verdict had the error not occurred." *State v. Martin*, 2012 WI 96, ¶45, 343 Wis. 2d 278, 816 N.W.2d 270 (citation omitted). We conclude that the State has not met its burden for the following reasons.

20

¶51    First, the erroneously excluded evidence was not about a periphery matter. Instead, it was directly relevant to matters that were the central focus of Jarvi's defense. *See State v. Monahan*, 2018 WI 80, ¶35, 383 Wis. 2d 100, 913 N.W.2d 894 (we consider "the importance of the … excluded evidence" and "the nature of the defense" in the harmless error analysis). As mentioned, the focus of Jarvi's defense was that, based on A.B.'s conduct and statements, he did not have actual knowledge that A.B. lacked the capacity to consent, nor did he have the purpose to have sexual intercourse with her while she was incapable of giving consent. And as discussed, the excluded statements, if believed, relate to A.B.'s ability to process information and make decisions of her own volition, and were probative on both of these points.

¶52    Second, we cannot overlook the effect that the circuit court's erroneous instructions would have had on the jury's understanding of what it could consider when evaluating the disputed elements of this crime. As noted, the court expressly instructed the jury to disregard relevant testimony about what A.B. purportedly said immediately before and during the alleged assault. That is, the court told the jury to "disregard all the statements that Mr. Jarvi has made as to statements that … he indicates that [A.B.] … made. He can't testify as to hearsay, and it is all hearsay, other than what is already in the record prior to [Jarvi's] testimony." We assume that a jury will follow a court's instruction, *State v. Booth*, 147 Wis. 2d 208, 216, 432 N.W.2d 681 (Ct. App. 1988), and here, it is likely that the jury would have understood—incorrectly—that it could not consider relevant evidence when assessing Jarvi's actual knowledge about A.B.'s capacity to consent and Jarvi's purpose.

¶53    Third, we also cannot overlook the effect that the frequent interruptions and erroneous instructions and directions that occurred in this case

may have had on the jury's assessment of Jarvi's testimony. As noted, Jarvi's testimony was repeatedly interrupted by unfounded objections, and Jarvi was erroneously instructed to convey his account without repeating anything that A.B. allegedly told him at important moments. Beyond any effect that the instructions may have had on the content of Jarvi's testimony, under the circumstances of this case, the repeated interruptions and redirections had the potential to impair his confidence, coherence, and demeanor, which had the potential to influence the jury's assessment of his credibility. The jury's assessment of Jarvi's credibility was paramount in this criminal trial, and we cannot say beyond a reasonable doubt that the errors here would not have affected that assessment.

¶54 Finally, we are unpersuaded by the State's argument that the exclusion of A.B.'s purported statements was harmless because Jarvi was able to describe her conduct and demeanor before, during, and after the alleged assault. It is certainly true that, as recounted in the background section above, Jarvi was able to provide detailed testimony about his observations of A.B.'s demeanor, and his reasons for believing that she was not too intoxicated to consent to intercourse. Despite the erroneous constraints imposed by the circuit court, Jarvi was also able to provide significant testimony about A.B.'s actions and responses, and specifically, that she initiated the sexual encounter and made physical gestures indicating consent and responding favorably to sexual contact. Yet, based on our review of the record, we are not persuaded that the disputed elements were established to "such a degree" that the additional testimony Jarvi might have provided could not have bolstered Jarvi's defense and "created … reasonable doubt" in the minds of some jurors. *See State v. Prineas*, 2012 WI App 2, ¶27, 338 Wis. 2d 362, 809 N.W.2d 68. These concerns are further underscored when viewed in the context of the court's erroneous instructions to the jury, and the

potential effect of the erroneous interruptions and constraints on the jury's assessment of Jarvi's credibility. Accordingly, based on this record, we cannot conclude beyond a reasonable doubt that the jury would have reached the same verdict in the absence of the evidentiary errors. We therefore affirm the circuit court order that vacated Jarvi's conviction and granted a new trial.

¶55 We could end our discussion here, given our conclusion that Jarvi's conviction must be reversed due to evidentiary error. That is, we need not address the parties' arguments about the other trial issues that, in Jarvi's view, also warrant the reversal of his criminal conviction. However, the State contends that the circuit court's exclusion of the expert testimony is the "law of the case," and the parties have fully briefed this issue, which is likely to resurface if there is a new trial. Therefore, we briefly address it in the interest of judicial efficiency, to provide guidance for the proceedings on remand.

## II. Expert Testimony

¶56 Jarvi contends that the circuit court erroneously exercised its discretion when it excluded the testimony of his expert witness, Dr. Fromme. He further contends that the exclusion of this testimony violated his constitutional right to present a defense.

¶57 Fromme's proffered testimony centered, in pertinent part, on her research into alcohol-induced blackouts. At the *Daubert* hearing, Fromme testified about how alcohol can affect both memory and other cognitive functions as follows. Alcohol can have "a wide range of significant effects on memory, from mild impairment to complete amnesia." An alcohol-induced blackout is "an episode of amnesia or failure to remember" that occurs when alcohol consumption "impairs [the] transfer of information from short-term memory … to long-term

23

memory." Although a person experiencing an alcohol-induced blackout is not forming long-term memories, the person can be "well aware of what they're doing in the moment" and can be "fully conscious" and "able to make voluntary decisions" and "execute complex behaviors." Fromme would have testified that there are "no objective, observable signs that someone is in a blackout," and that an observer would have "no way of knowing" that the person is experiencing a blackout. Fromme distinguished the condition of blackout from incapacity, and testified that "[u]nless a person has lost consciousness, we can only speculate about … their cognitive abilities and their ability to think and reason. All we can really do is look at their actions and infer their underlying cognitive behavior."

¶58 With respect to the facts of this specific case, Fromme indicated that she would have opined to a "reasonable degree of scientific certainty" that A.B. "experienced a blackout" the night of the alleged assault, and that Jarvi, "who had also been drinking … would be unable to tell the level of [A.B.'s] intoxication, nor would he have any way of knowing she was experiencing a blackout."

¶59 WISCONSIN STAT. § 907.02 governs the admissibility of expert testimony in Wisconsin. Section 907.02(1), which adopted the federal "reliability" standard from *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny, specifically provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

24

Embedded in § 907.02(1) are "three threshold requirements for admitting expert witness testimony: the witness must be qualified …; the witness's testimony must be relevant …; and the witness's testimony must be reliable …." **State v. Hogan**, 2021 WI App 24, ¶19, 397 Wis. 2d 171, 959 N.W.2d 658.[6]

¶60    Here, the State did not dispute Fromme's qualifications, and the circuit court excluded her testimony based in part on its assessment of its relevance and reliability.  We address each in turn in the discussion that follows.  In so doing, we do not purport to decide the admissibility of Fromme's testimony or whether Jarvi had a constitutional right to present it.  However, while it may have been within the court's discretion to exclude Fromme's testimony for other reasons, we conclude that some of the specific reasons that the court gave for excluding the testimony wholesale do not stand up to appellate scrutiny.

## A. Relevance

¶61    Under WIS. STAT. § 907.02(1), the inquiry into relevance turns on whether the expert's testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Here, the circuit court determined that Fromme's testimony would not assist the trier of fact.  It stated that the need for expert testimony on alcohol-induced memory loss was "extremely weak" because

---

[6] In some circumstances, a circuit court may exercise its discretion to exclude expert evidence even if these threshold requirements are satisfied.  If so, a defendant may assert that the ruling violates the defendant's constitutional right to present a defense, and the court should address the constitutional claim under the framework set forth in **State v. St. George**, 2022 WI 50, 252 Wis. 2d 499, 643 N.W.2d 777.  Notably, if the defendant asserts that the exclusion of expert testimony deprives the defendant of the constitutional right to present a defense, the court commits an "error of law" if it fails to consider the claim. **Id.**, ¶48.

"[a]lcohol consumption, and the experience of observing those who are intoxicated to a very high degree … is so commonplace."

¶62   It may well be that some jurors would have personal experience consuming alcohol and observing persons who are intoxicated, but it does not necessarily follow that Fromme's research on these topics would be of no assistance to jurors in understanding the evidence or determining a fact in issue. *See State v. St. George*, 2002 WI 50, ¶40, 252 Wis. 2d 499, 643 N.W.2d 777 (an expert can assist the jury if "he or she has superior knowledge in the area in which the precise question lies").   Indeed, the need for expert testimony may be especially strong when the testimony suggests that commonly held beliefs or expectations are likely to be incorrect.  *State v. Jensen*, 147 Wis. 2d 240, 252, 257, 432 N.W.2d 913 (1988) (expert testimony about behavior may be helpful when the behavior at issue does not conform with commonly held expectations).

¶63   Here, as noted, A.B. testified that she was "blackout drunk" and did not remember "chunks of the night."  Contrary to the circuit court's reasoning, Fromme's proffered testimony, which centered on research into alcohol-induced blackouts, would have been relevant because, if credited, it could have combatted misperceptions that jurors might have based on their own experiences and beliefs. More specifically, Fromme's research could have combatted the potential inferences that, if A.B. drank enough alcohol to experience an alcohol-induced blackout, she must have been too intoxicated to have the capacity to consent, and that under the circumstances, her incapacity would have been evident to an observer such as Jarvi.  Jurors may have also assumed that A.B.'s account of being "blacked out" at the time of sexual intercourse meant that she was "passed out" or unconscious and unable to give consent for that reason.  If credited, Fromme's proffered testimony would have explained that this is not necessarily the case, and

that people experiencing alcohol-induced blackouts may be capable of performing a wide range of activities and functions.

¶64    Indeed, in closing arguments, and in the absence of expert testimony on this topic, the prosecutor was able to incorporate potential misperceptions about how someone who was experiencing a blackout would appear to observers. Specifically, in addition to cataloging the testimony about A.B.'s physical manifestations of impairment, the prosecutor argued: "[Jarvi's] telling us today that he didn't see any impairment, but [A.B.'s] telling us the complete opposite, that she was blackout drunk."  Expert testimony regarding Fromme's research could have assisted the jury in its evaluation of any link that was being drawn between being blackout drunk and perceptible signs of incapacity. *See* WIS. STAT. § 907.02(1) (expert testimony "assist[s] the trier of fact" if it helps the trier "understand the evidence [and] to determine a fact in issue").

## B. Reliability

¶65    We now consider the circuit court's determination that Fromme's testimony did not meet WIS. STAT. § 907.02's reliability requirement.  Under § 907.02(1), an expert's testimony is reliable if it is "based upon sufficient facts or data"; if it is "the product of reliable principles and methods"; and if "the witness has applied the principles and methods reliably to the facts of the case."  (Citing § 907.02(1).)

¶66    Here, the circuit court did not express any concerns about the reliability of Fromme's research or the research of others in her field on which she relied.  It instead questioned the reliability of Fromme's ultimate opinions about what happened on the night of the alleged assault—that A.B. experienced an alcohol-induced blackout; that Jarvi would have been a "poor judge" of A.B.'s

27

level of intoxication; and that Jarvi would have "no way of knowing" that A.B. was experiencing an alcohol-induced blackout. Specifically, the court opined that these opinions "lack[] any reasonable foundation" because Fromme did not "observe the events of this case," and further, that Fromme "failed to follow her own methodology." More specifically, the court stated that Fromme's findings about alcohol-induced blackouts were the "result of tightly controlled studies of alcohol consumption," and that here, Fromme formed an opinion that A.B. experienced an alcohol-induced blackout "without any chemical analysis," without knowing precisely "how much alcohol [A.B.] consumed" or "the frequency of such consumption," and without knowing what precisely "caused the blackout." The court also expressed concern that Fromme's testimony would invade the province of the jury, and that Fromme seemed to be offering an opinion about A.B.'s capacity without having access to any objective information about how A.B. was presenting on the night in question.

¶67 Yet, even if the circuit court was correct to exclude Fromme's ultimate opinions about what happened on the night of the alleged assault, the court's rationale does not provide a basis for excluding Fromme's testimony about the relevant research in her field. It is well established that an expert can provide "exposition testimony on general principles without explicitly applying those principles to … the specific facts of the case," provided that those principles are "'sufficiently tied to the facts of the case' such that '[the testimony] will aid the jury in resolving a factual dispute.'" *State v. Dobbs*, 2020 WI 64, ¶¶42, 44, 392 Wis. 2d 505, 945 N.W.2d 609 (citation omitted). Here, it was undisputed that A.B. experienced a blackout, and as noted, Fromme's exposition testimony could have helped the jury in resolving the factual disputes about how both participants could have experienced A.B.'s blackout state on the night of the alleged assault.

**CONCLUSION**

¶68 For the reasons explained above, we conclude that the circuit court committed reversible error when it prevented Jarvi from testifying to statements that A.B. purportedly made before, during, and after the alleged assault. We therefore affirm the circuit court order that vacated Jarvi's judgment of conviction and granted a new trial.

*By the Court.*—Order affirmed and cause remanded.

Not recommended for publication in the official reports.