COURT OF APPEALS
DECISION
DATED AND FILED

January 6, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1105-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF685

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

LUTHER A. KELLOGG,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Outagamie County: EMILY I. LONERGAN, Judge. *Affirmed.*

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Luther A. Kellogg appeals from a judgment, entered pursuant to a jury verdict, convicting him of repeated sexual assault of the

same child. Kellogg requests a new trial based on what he identifies as circuit court error with regard to both the exclusion of testimony from two expert witnesses and evidence of a witness's prior convictions. For the reasons that follow, we reject all of Kellogg's arguments and affirm.

## BACKGROUND

¶2 Kellogg's conviction was based on the allegations of Nicola,[1] a relative of Kellogg's, who disclosed during a forensic interview at the Fox Valley Child Advocacy Center (CAC) that Kellogg sexually assaulted her when she was between four and five years old at his home in New London, Wisconsin. During the CAC interview, conducted by Nina Maroszek-Brennan in May 2018, Nicola described several different incidents where Kellogg had sexual contact with her. Based on Nicola's interview, the State charged Kellogg with one count of repeated sexual assault of the same child.

¶3 Before trial, Kellogg sought to admit testimony from two expert witnesses: Dr. Richard Frederick and Tristan Wristen. Frederick, a clinical psychologist, would have offered an opinion regarding problems he saw in Nicola's forensic interview. The circuit court held a **Daubert** hearing to assess Frederick's qualifications under WIS. STAT. § 907.02(1).[2] The court ultimately

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2023-24), the State uses the pseudonyms "Nicola" for the victim and "Esther" for the victim's mother in its brief, and we will do the same.

All references to the Wisconsin Statutes are to the 2023-24 version.

[2] WISCONSIN STAT. § 907.02(1) adopts the federal "reliability" standard developed in **Daubert v. Merrell Dow Pharmaceuticals, Inc.**, 509 U.S. 579 (1993). **State v. Giese**, 2014 WI App 92, ¶17, 356 Wis. 2d 796, 854 N.W.2d 687.

excluded Frederick as an expert witness after determining that he was not qualified to critique the forensic interview and that his opinion was unreliable.

¶4 Wristen, a forensic nurse and sexual assault nurse examiner (SANE), would have offered her opinion about the sexual assault exam conducted on Nicola (the SANE exam), the quality of Nicola's forensic interview, and the therapy that Nicola participated in after the forensic interview.[3] The circuit court also held a ***Daubert*** hearing on the admissibility of Wristen's expert testimony and later issued an oral ruling partially excluding her testimony. The court determined that Wristen could testify regarding Nicola's SANE exam and the best practices for asking child victims questions about the assault during a SANE exam. However, the court limited Wristen's testimony by precluding her from testifying regarding Nicola's forensic interview or offering her opinions on the impact that therapy may have on memory or recall.

¶5 The circuit court held a four-day jury trial in March 2022. On the first day of trial, the parties discussed Esther's prior convictions for impeachment purposes under WIS. STAT. § 906.09. Of Esther's eight total convictions, the State argued that the jury should be informed that Esther had only one conviction, while Kellogg asked for the jury to be told she had seven convictions. The court allowed the jury to hear that Esther had one conviction, noting that all of her remaining convictions were at least ten years old.

---

[3] Previously, the State had requested, and the circuit court granted, a request for in camera inspection of Nicola's therapy records. The court released the records under seal to only the prosecutor in the case and Kellogg's defense counsel. Kellogg then sought release of Nicola's therapy records for Wristen's review, and the State objected to this request. The court eventually denied Wristen access to Nicola's therapy records.

¶6 At trial, Esther testified that she was incarcerated in November 2011 when Nicola was born and that she made arrangements for Nicola to stay with Kellogg and Esther's mother until Nicola wished to live with Esther. In late January 2018, Nicola stated that she "wished to come live" with Esther and her husband. According to Esther, the move was "somewhat difficult on [her] mom." It caused tension, leading Esther and Nicola not to see either Kellogg or Esther's mother between late January and April 2018.

¶7 On April 30, 2018, Esther received a phone call from a social worker informing her that Nicola had reported "that something had happened" with Kellogg. Thereafter, Esther took Nicola to the CAC. Esther testified that she did not observe the CAC interview, watch the video, or otherwise learn any details about the allegations. She testified that she had been convicted of a crime once.

¶8 Kylie Hayes, a counselor at Nicola's elementary school, testified that the children at the elementary school, including Nicola, attended a presentation about "good touch" and "bad touch." The presentation included discussions of "private parts," explaining when it is appropriate for someone to touch private parts, distinguishing between "good secrets" and "bad secrets," and encouraging the children to tell a trusted adult if they have a "bad secret." According to Hayes' testimony, immediately after that presentation, Nicola approached her and reported information about Kellogg. As a mandatory reporter, Hayes reported the disclosure to Child Protective Services.

¶9 Kristin Radue, a social worker with Winnebago County Human Services, testified that she was the "initial assessment social worker" assigned to investigate Nicola's disclosure. Radue had an initial meeting with Nicola, Esther, and Esther's husband, during which Radue "learned that [Nicola] had reported that

4

she was having bad dreams that were waking her up at night and that [Nicola] had also made a disclosure to her mom" "that she was being touched in her private parts by" Kellogg. After Radue reviewed Nicola's CAC interview, she spoke with Kellogg, who stated that he and his wife were Nicola's primary caretakers since she was a newborn. Radue also explained, however, that Kellogg "made a statement that he was never alone with [Nicola], which was a little bit confusing" because he told Radue that he spent an "equal amount of time raising [Nicola]." On cross-examination, Radue confirmed that Esther made the statement to her that Kellogg had touched Nicola.

¶10 Maroszek-Brennan next testified that she conducted the CAC interview with Nicola when Nicola was six years old. Maroszek-Brennan authenticated the recording of that interview, and it was played for the jury in its entirety. During the interview, Nicola specifically described three of several different incidents—in Nicola's uncle's bedroom, in the bathroom, and on the couch—where Kellogg touched her privates with either his penis or his fingers and put his penis in Nicola's mouth. She also described "watery stuff" that came out of Kellogg's penis, and the watery stuff looked like "white lasagna syrup" and had "black spots" in it. Nicola said that Kellogg told her not to tell anyone about what he did. Nicola explained that she was four years old when Kellogg first assaulted her and that the other assaults occurred when she was five. She also told Maroszek-Brennan that the assault in her uncle's bedroom occurred once, but the other incidents occurred more than once.

¶11 Nicola, who was ten years old at the time of the trial, also testified. Nicola testified that she remembered the CAC interview, that she went to the CAC because she "was sexually abused" by Kellogg, and that everything she told Maroszek-Brennan that day was the truth. On cross-examination, Nicola agreed

that in 2019 she told her therapist that she was not sexually abused and that Esther thinks she was abused. On redirect, Nicola agreed, when asked, that Kellogg put his penis in her mouth and in her bottom, but she could not remember Kellogg putting his penis in her vagina or digitally penetrating her.

¶12 The State then presented testimony from Dr. Gregory Hunter, an emergency room doctor with 30 years' experience, who testified that he has encountered patients who complained of "black spots in their semen." According to Hunter, the condition is called "hematospermia," and "the black spots can be very dark red or black and is in most cases thought to be blood present in the ejaculate or sperm." He further explained the various causes of hematospermia and stated that the condition usually resolves without treatment. Hunter was not aware how common hematospermia is, and he admitted that emergency room visits for hematospermia are "not very common."

¶13 Jennifer Yates, the SANE who conducted Nicola's SANE exam, also testified. According to Yates, Nicola "had a normal anogenital examination." Yates explained, however, that "[i]t's commonly known in the field of child sexual abuse that the majority of the children that we see"—up to 90 to 95 percent—"will have normal genital, anal examinations," even in those children "reporting penetration."

¶14 Ashley Strunk, Nicola's therapist for the past three years, testified that therapy was helping Nicola work through and understand the trauma she experienced. According to Strunk, although Esther relayed the sexual abuse allegation to her at the beginning of Nicola's treatment, Nicola did not disclose the sexual abuse to Strunk right away; it took multiple sessions for Nicola to be able

to talk about the details. Strunk testified that Nicola first denied that she had been sexually assaulted because Nicola said that thinking about it gave her nightmares.

¶15    After the State rested, Kellogg called several witnesses, including Kimberly Brown, a nurse practitioner who treated Kellogg on January 17, 2018. Brown testified that she treated Kellogg that day for high cholesterol, GERD, and diabetes. She explained that none of Kellogg's medical records reflected a diagnosis of hematospermia or included Kellogg's complaints of dark spots in his semen, but she also admitted that she had never "heard of hematospermia." Brown acknowledged that Kellogg's records may not have been "an exhaustive list … of everything he's ever been seen for," and she relayed that Kellogg had been treated in the past both for high blood pressure and recurring infections.

¶16    Wristen was then called to testify regarding her review of the SANE exam. According to Wristen, "[i]n children specifically, especially in younger child[ren], age 4 and 5, there are certain findings that we see after the fact that are related to sexual assault," especially in cases where the allegations are of an adult male with a very young female victim. Wristen testified that Nicola's exam showed no such injuries or scars and that there were not any "findings that would confirm a sexual assault."

¶17    Esther's mother testified that when Nicola lived with her, Nicola never claimed that Kellogg was sexually abusing her. She also stated that she never saw, heard, or suspected any such abuse. On cross-examination, Esther's mother acknowledged that she had health issues at the time of the alleged assaults and was frequently not in the same room or area of the house as Nicola and Kellogg. She also stated that she "was heavily on a lot of narcotics" during that

period and not in her "right state of mind," so it is "possible" that Nicola told her about Kellogg's inappropriate touching but that she did not realize it.

¶18    Finally, Nicola's uncle testified that he lived with Nicola at the time of the alleged assaults when he was a teenager.  He denied seeing any inappropriate contact between Nicola and Kellogg and testified that Nicola never told him about any sexual contact.  Nicola's uncle did admit, however, that he was often hanging out with friends or playing games in his room.

¶19    The jury returned a guilty verdict against Kellogg on the charge of repeated sexual assault of the same child.  The circuit court later sentenced Kellogg to 37 years' incarceration, comprised of 22 years' initial confinement followed by 15 years' extended supervision.  Kellogg appeals.

## DISCUSSION

¶20    On appeal, Kellogg seeks a new trial on three bases.  First, he challenges the circuit court's decision to exclude Frederick's testimony.  Second, he argues that the court erroneously exercised its discretion by limiting Wristen's testimony and precluding her from reviewing Nicola's therapy records.  Finally, he asserts that the court erred by excluding some of Esther's prior conviction evidence that was offered for impeachment purposes.  For the reasons that follow, we reject all of Kellogg's arguments and conclude that the circuit court did not erroneously exercise its discretion with regard to any of these issues.

### I.  Expert Testimony

¶21    Kellogg argues that the circuit court erred by excluding Frederick's expert testimony and limiting Wristen's expert testimony "despite both experts meeting the requirements for admissibility under WIS. STAT. § 907.02."

According to Kellogg, "[b]ecause the case hinged on the credibility of an allegation elicited through a forensic interview, expert testimony about the reliability of that interview was vital to an effective defense of Mr. Kellogg," and the court's alleged error "unreasonably and arbitrarily precluded Mr. Kellogg from presenting vital expert testimony."

¶22 WISCONSIN STAT. § 907.02 governs the admission of expert testimony. *State v. Hogan*, 2021 WI App 24, ¶18, 397 Wis. 2d 171, 959 N.W.2d 658.

> [E]mbodied in § 907.02(1) are three threshold requirements for admitting expert witness testimony: the witness must be *qualified* ("a witness qualified as an expert by knowledge, skill, experience, training, or education"); the witness's testimony must be *relevant* ("[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"); and, per the 2011 amendment adopting the *Daubert* standard, the witness's testimony must be *reliable* ("if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case").

*Hogan*, 397 Wis. 2d 171, ¶19 (alteration in original; quoting § 907.02(1)). Thus, the circuit court is required to "stand[] as a gatekeeper to prevent irrelevant or unreliable testimony from being admitted." *State v. Dobbs*, 2020 WI 64, ¶43, 392 Wis. 2d 505, 945 N.W.2d 609 (citations omitted); *see also State v. Giese*, 2014 WI App 92, ¶18, 356 Wis. 2d 796, 854 N.W.2d 687 ("The court's gate-keeper function under the *Daubert* standard is to ensure that the expert's opinion is based on a reliable foundation and is relevant to the material issues."). "The goal is to prevent the jury from hearing conjecture dressed up in the guise of expert opinion." *Giese*, 356 Wis. 2d 796, ¶19.

¶23 "The admissibility of expert opinion testimony lies in the discretion of the circuit court," which we review for an erroneous exercise of discretion.[4] *State v. Shomberg*, 2006 WI 9, ¶10, 288 Wis. 2d 1, 709 N.W.2d 370 (citation omitted). Therefore, "we will not reverse a circuit court's decision if the decision 'had a reasonable basis,' and 'was made in accordance with accepted legal standards and in accordance with the facts of record.'" *Dobbs*, 392 Wis. 2d 505, ¶27 (citation omitted). "The test is not whether this court agrees with the ruling of the [circuit] court, but whether appropriate discretion was in fact exercised." *Shomberg*, 288 Wis. 2d 1, ¶11 (citation omitted). We may "search the record for reasons to sustain [a] circuit court's exercise of discretion." *State v. Pico*, 2018 WI 66, ¶15, 382 Wis. 2d 273, 914 N.W.2d 95 (citation omitted). Moreover, "[w]e accept [a] circuit court's findings of fact unless they are clearly erroneous." *Dobbs*, 392 Wis. 2d 505, ¶32.

### A. Dr. Richard Frederick

¶24 As noted above, Kellogg sought to call Frederick to offer expert testimony concerning problems Frederick noted with Nicola's forensic interview. At the *Daubert* hearing, Frederick testified that he is a psychologist licensed in Wisconsin and board certified in forensic psychology and assessment psychology with an expertise in forensic interviewing protocols, memory, and forensic psychology. Importantly, however, Frederick also testified that he is not a *child* psychologist, is not a child forensic examiner, and would not act as a child

---

[4] Although the circuit court's decision to admit testimony is reviewed for an erroneous exercise of discretion, Kellogg argues that "[a]n appellate court reviews a [circuit] court's application of WIS. STAT. § 907.02(1) de novo while benefiting from its analysis." *See Seifert v. Balink*, 2017 WI 2, ¶89, 372 Wis. 2d 525, 888 N.W.2d 816.

psychologist in this case. Frederick testified that he had never conducted a forensic interview of a child; none of the previous workshops he presented, papers he wrote, or presentations he gave "specifically pertained to the subject of forensic interviewing of children"; none of the books he authored or coauthored "pertain to the issue of conducting a forensic interview with a child"; and he had not completed trainings or certifications that are required for child forensic examinations in Wisconsin.

¶25 When asked about the "specialized or scientific basis for the opinions that [Frederick] formed in this case," he explained, "I'm not a researcher in this field, but I'm a consumer of research at the professional level and I'm able to read and digest research and apply it to this case, which is what I've done." According to Frederick, "[t]here are hundreds of published papers that deal with best practices that relate to child forensic interviewing." Therefore, his role in the case, "as a scientist practitioner who is familiar with how to apply scientific knowledge," is the "simple matter" of "review[ing] the child forensic interview and … evaluat[ing] whether or not [it] conform[ed] to the best practices."

¶26 Frederick further noted that he had "consult[ed]" in "about 50 … cases over the past … three or four years" and that he had testified not more than "a few times," but he had "never testified in a jury trial to give [his] opinion regarding a forensic interview." He explained that he was recently "qualified as an expert in the area of how memory works and the best practices for forensic interviewing" at a *Daubert* hearing in a Marathon County criminal case, but that case had not yet gone to trial. Frederick also testified that he was excluded as an expert, without a *Daubert* hearing, in a Portage County case after "the judge ruled that [he] wasn't qualified because [he is] not a child psychologist or a child forensic interviewer."

¶27     We conclude that the circuit court did not erroneously exercise its discretion by excluding Frederick's expert testimony because he was not qualified to testify regarding child forensic interview techniques.  On the record, the court correctly identified that it was applying WIS. STAT. § 907.02(1) and the *Daubert* standard.  The court then noted each of the requirements under § 907.02(1) and applied Frederick's testimony and qualifications to those requirements.

¶28     As an initial matter, the circuit court first found that this "type of testimony"—i.e., testimony that would help jurors critically review Nicola's forensic interview—"would assist the trier of fact."  *See* WIS. STAT. § 907.02(1).  In other words, it found the "type of testimony" to be relevant.[5]  *See Hogan*, 397 Wis. 2d 171, ¶19; *see also State v. Maday*, 2017 WI 28, ¶33, 374 Wis. 2d 164, 892 N.W.2d 611 ("[A] jury could benefit from an expert's assistance when interpreting and identifying the indications bearing on the independence of a child's allegations of abuse when such situations arise.").

¶29     Nevertheless, while the circuit court determined that the "type" of testimony was relevant, it found that Frederick's specific testimony failed to meet the other two WIS. STAT. § 907.02(1) requirements, as Frederick was not "qualified as an expert by knowledge, skill, experience, training, or education," and his testimony was not "based upon sufficient facts or data, [was not] the product of reliable principles and methods, and [he had not] applied the principles and methods reliably to the facts of the case."  The court explained that while

---

[5] Although Kellogg notes on appeal that "the circuit court agreed that Dr. Frederick's testimony on child forensic interviewing and memory was relevant and would assist the trier of fact," as the State correctly observes, the court actually said "[t]hat type of testimony" was relevant, and the court's finding "was based on hypothetical testimony, not Frederick's, mainly because Frederick was unqualified and did not offer a reliable opinion."

Frederick certainly had experience in the area of forensic interviewing, which was a "large field," his expertise was limited to adults, and, based on Frederick's testimony, he had absolutely no experience personally "in the area of forensic interviewing of children." Furthermore, the court noted that Frederick did not complete the training or certifications that are required for child forensic examinations in Wisconsin, was not certified in Wisconsin to conduct forensic interviews of children, and "was not aware during cross-examination really of what the standards in Wisconsin [are] with respect to forensic interviews of children." Based on this evidence, the circuit court determined that Frederick was not qualified to offer his opinion on the propriety of Maroszek-Brennan's technique or questions during Nicola's forensic interview.

¶30 As to reliability, the circuit court found certain portions of Frederick's testimony to be "concerning" and "problematic." The court observed that Frederick's "experience as it relates to children and forensic interviews of children really comes primarily from having read … various reports and … different research that he's relied upon to come to these conclusions." Further, the court noted that Frederick had not "reliably applied the principles and methods to the facts of the case" because "he was basing his knowledge of what was probable or improbable on common sense."

¶31 For example, the circuit court noted two areas of Frederick's hearing testimony that specifically demonstrated unreliability. First, Frederick said that Nicola's description of seeing black spots in Kellogg's semen after one of the assaults was "confabulation," "obviously false," and "does not ring true" and that Maroszek-Brennan should have explored "alternative explanations." He based this belief on his personal knowledge of semen; an internet search; and the knowledge of his colleague, Dr. David Thompson, who is also a psychologist.

13

After the prosecutor brought up hematospermia, which Frederick was not aware of, he said he "would be willing to walk [his comment] back," and he instead called this detail of Nicola's sexual assault allegation "improbable." The court found his testimony "problematic" because "[a]nybody can conduct an internet search, anybody can ask someone else who may or may not be an expert," but "these just aren't things that are used by experts."

¶32    Second, the circuit court referenced Frederick's testimony that Nicola's allegation that one of the assaults occurred while her grandmother and uncle were also in the home was a "strong indicator of unreliability" that Maroszek-Brennan should have explored further, based on the unlikelihood that someone would rape a child while others were in earshot. When asked what research he relied on to reach that opinion, and when confronted with an article stating that such assaults frequently occur while others are nearby, Frederick stated that his opinion was based on "common sense" and that he had no contrary research on the subject. The court found that this testimony was not a reliable application of scientific principles or methods, and "[t]here wasn't any research or scientific basis for the belief that [Nicola's report] was unreliable" on that basis.

¶33    Given our review of the above evidence, the circuit court appropriately considered the relevant facts, applied the proper standard, and articulated a reasonable basis for its determination that Frederick's opinions did not satisfy WIS. STAT. § 907.02(1)'s qualification and reliability standards. We agree with the State that "it was reasonable for the circuit court, in its gatekeeper role, to reject testimony from a psychologist untrained and inexperienced in child forensic interviewing critiquing a trained and experienced interviewer based on a handful of articles on general topics related to child interviews."

14

¶34    Kellogg's preeminent argument on appeal focuses on his comparison between the circuit court's consideration of Frederick's qualifications versus Hunter's qualifications, stating that "the court arbitrarily applied different legal standards" to the two experts and, specifically, applied a broader and more liberal standard when admitting Hunter's testimony.[6]  Thus, Kellogg claims, the legal standard applied to Frederick was improper under WIS. STAT. § 907.02.

¶35    We are not persuaded by Kellogg's arguments comparing the circuit court's reviews of Frederick's and Hunter's qualifications.    This is an apples-to-oranges comparison.  As the State explains, it "introduced Dr. Hunter to testify on a very limited point: to explain that hematospermia [is] a medical condition that occur[s] when flecks of blood, often appearing as dark spots, appear[] in semen."  Essentially, the purpose of Hunter's testimony was simply to establish for the jury that black spots in semen could occur.  Hunter was clearly qualified to testify on that limited point given his 30 years of experience as an emergency room doctor, during which he had seen patients who presented with this complaint.  Under this limited circumstance, it was not necessary for the State to have found a urologist or other such specialist to testify because the jury did not need to understand the details of the condition for the purpose of this case, nor did Hunter offer an opinion as to whether Kellogg had the condition; it was sufficient for the jury to know that the condition exists.

¶36    In contrast, Kellogg offered testimony from Frederick as an expert in forensic interviewing, memory, and forensic psychology.  His testimony was

---

[6] Kellogg states that "[b]ecause the court applied the proper legal standard when qualifying Dr. Hunter as an expert, Mr. Kellogg does not challenge the circuit court's ruling on the admissibility of Dr. Hunter's testimony."

offered for the purpose of explaining to the jury the best practices that relate to child forensic interviewing and whether the forensic interview in this case conformed to those best practices. However, Frederick was not a forensic interviewer, he otherwise had not worked with children, he had no training in conducting forensic interviews of children, and he had not written or presented on the subject. The basis for Frederick's knowledge on the subject was his review of the literature of others and common sense, which the circuit court concluded did not make him an expert regarding *child* forensic interviewing. Thus, the court's decision to admit Hunter's testimony did not contradict its decision to exclude Frederick's testimony.

¶37 Kellogg argues that "[a]n expert need not 'have personally performed the activities at issue in order for him or her to give an opinion thereon.'" *See* ***Hennig v. Ahearn***, 230 Wis. 2d 149, 181, 601 N.W.2d 14 (Ct. App. 1999). Kellogg, however, fails to include the second part of the ***Hennig*** quote, which states, "provided that the expert is 'qualified as an expert by knowledge, skill, experience, training, or education' regarding the matters at issue." ***Id.*** (citation omitted). Additionally, the ***Hennig*** court was referring to an attorney testifying on the customs of business executives. ***Id.*** The ***Hennig*** court then gave the example that "an automobile mechanic should be permitted to testify regarding the adequacy of warnings on automobile batteries" even though "the mechanic had not been involved in designing or writing warnings for automobile batteries" because "he had 'disassembled thousands of batteries' and understood 'the chemical and electrical processes' and 'what causes batteries to explode.'" ***Id.*** (quoting ***Tanner v. Shoupe***, 228 Wis. 2d 357, 814, 596 N.W.2d 805 (Ct. App. 1999)).

¶38   We are not persuaded that the circuit court erroneously exercised its discretion by finding that Frederick was not qualified in the field of child forensic interviewing "by knowledge, skill, experience, training, or education" because the circumstances described in *Hennig* and *Tanner* are markedly different from the circumstances here. *See Hennig*, 230 Wis. 2d at 181. As the State aptly explains,

> It is plainly appropriate for a court to consider whether the proposed expert is qualified within the specific discipline they are critiquing. It is not "arbitrary" to weigh against admission that proposed expert's lack of training, qualifications, or experience in performing the task they are critiquing.
>
> And the fact that Frederick lacked relevant experience was only part of the problem. As the circuit court noted, child forensic interviewing is markedly different from adult interviewing, requiring specialized training in Wisconsin-specific protocols to be certified to do the job. Dr. Frederick has not only never done a forensic interview of a child, he also has no training on it (either based on national best practices or Wisconsin-specific protocols), and he was by his own admission unqualified to conduct such an interview.

¶39   In summary, under the circumstances of this case, it was not an erroneous exercise of discretion for the circuit court to determine that Frederick's testimony was not admissible under WIS. STAT. § 907.02(1). The court soundly concluded that Frederick lacked the "knowledge, skill, experience, training, or education" related to Wisconsin's child forensic interview protocols, which differ from the protocols for adult forensic interviews. Thus, the court's decision was a reasonable exercise of its gatekeeping function under § 907.02(1).

*B. Tristan Wristen*

¶40   Kellogg next argues that the circuit court erroneously exercised its discretion by limiting Wristen's expert testimony to Nicola's SANE exam and the best practices for asking child victims questions about alleged assaults in the

17

context of a SANE exam. When discussing Wristen's testimony, the circuit court divided her proposed testimony into three categories: (1) the forensic interview, (2) the SANE exam, and (3) the counseling that Nicola received. The circuit court determined that Wristen was well qualified to provide expert testimony and opine with respect to the SANE exam. Wristen is a SANE, she teaches undergraduate students, she trains graduate nursing students pursuing master's degrees in forensic nursing, she trains other SANEs, she knows the protocols for SANE exams and has applied those protocols, and she is licensed to practice as a forensic nurse in Wisconsin and other states. Thus, the court determined that Wristen's testimony satisfied the requirements of WIS. STAT. § 907.02(1) to provide expert testimony regarding the SANE exam.

¶41    In contrast, the circuit court limited Wristen's testimony based on her lack of expertise, like Frederick, to opine on or critique Nicola's forensic interview or Nicola's counseling. Based on Wristen's own testimony, she had no licenses, training, or experience as a therapist, and she had no advanced counseling, therapy, or psychology degrees. At best, she explained that "psychiatric care of patients" was a "piece of our curriculum." Wristen had also never conducted a child forensic interview. She had not undergone training to become a forensic interviewer and acknowledged that she lacked the credentials to conduct a forensic interview in Wisconsin or at any accredited child advocacy center in the country. Finally, she was not "aware" of the accreditation standards for a forensic interviewer. While Wristen, like Frederick, was aware of national best practices for child forensic interviews, she was not familiar with the curriculum for forensic interviewers in Wisconsin or the Wisconsin-specific protocols or statute, and she admitted that she would not "know whether [Nicola's] interviewer followed the protocol that's established in Wisconsin."

18

¶42     We conclude that the circuit court's well-reasoned decision to limit Wristen's testimony evidences a proper exercise of discretion.  The court correctly considered the threshold requirements in WIS. STAT. § 907.02(1) based on Wristen's testimony.  It found that Wristen was not qualified "to testify to the best practices for forensic interviews or critique the interview conducted in this case," "looking at her specific qualifications with respect to this area," because she was not "certified as a child forensic interviewer," "her training in this area primarily consisted of watching videos of interviews and reading literature on best practices," and "she was not aware of the specific training or protocols adopted in Wisconsin."  The court also found that Wristen was not qualified to "testify regarding best practices or opinions about the impact of counseling on sexual assault victims," "particularly with respect to its impact on memory," because "[s]he does not have specialized education or experience in psychology," and her limited experience "relevant to psychology" was "[in]sufficient to qualify her to offer expert testimony" on this subject.

¶43     In terms of relevancy, the circuit court did not agree that Wristen's testimony would "assist the trier of fact" because it was concerned that "the defense's most salient points were" being "dressed up in the guise of expert opinion."  *See Giese*, 356 Wis. 2d 796, ¶19.  For example, the court noted that Wristen "wanted to provide some critiques or some differences between what was said … at the SANE examination, as compared to in the forensic interview, as compared to anywhere else that it might have shown up," but the court explained that this testimony could be elicited through cross-examination of other witnesses and addressed in closing argument.

¶44     As to reliability, the circuit court observed that Wristen had "a tendency to speculate or assume facts that were not in the record when she was

19

forming her opinions about the forensic interview." In support of its finding, the court provided the example that Wristen had concluded that Nicola "had been exposed to pornography because she talked about seeing part of a movie and deciding that she should not keep watching it," but the court explained that Nicola's "answer, frankly, in no way supported the conclusion that she was referring to pornography." The court was "troubled" that Wristen "was jumping to conclusions … without any supporting information."

¶45 As with Frederick, Kellogg challenges the circuit court's exercise of discretion based on his disagreement with the standard the court applied, calling it "an artificially narrow legal standard." In particular, Kellogg highlights Wristen's "training and experience in psychiatric nursing and how [psychiatric nursing] overlaps with forensic nursing," her "practical experience with child sexual assault evaluations and investigations," and her testimony "about the importance of making sure that both physical and verbal evidence is obtained appropriately so as to not taint the evidence collection process." Without outlining each of the contrary facts Kellogg highlights about Wristen, the bottom line is that his arguments fail to overcome our standard of review.

¶46 The circuit court's decision to limit Wristen's testimony had a reasonable basis, it followed the precepts of WIS. STAT. § 907.02(1), and it was based on testimony and other evidence in the record. *See **Shomberg***, 288 Wis. 2d 1, ¶27. We must therefore affirm the court's decision.

## II. Esther's Prior Convictions

¶47 We next consider Kellogg's challenge to the circuit court's evidentiary ruling that allowed Esther to admit to only one of her eight criminal convictions before the jury. As noted above, on the first day of trial, the parties

discussed how many of Esther's prior convictions could be used to impeach her credibility under WIS. STAT. § 906.09(1), based on the "presum[ption] that the number of convictions is relevant to a witness's credibility." *See State v. Smith*, 203 Wis. 2d 288, 297, 553 N.W.2d 824 (Ct. App. 1996). Pursuant to § 906.09(1), "a witness may be asked whether the witness has ever been convicted of a crime or adjudicated delinquent and the number of such convictions or adjudications" "[f]or the purpose of attacking character for truthfulness." Generally, "[i]f the witness's answers are consistent with" the number of convictions as determined to be admissible by the circuit court, "then no further inquiry may be made." *See* § 906.09(1), (3).

¶48 Significantly, prior conviction evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." WIS. STAT. § 906.09(2). Whether to admit or exclude evidence of a prior conviction for impeachment purposes rests in the circuit court's discretion. *State v. Gary M.B.*, 2004 WI 33, ¶19, 270 Wis. 2d 62, 676 N.W.2d 475. "This court will affirm a circuit court decision to admit evidence of prior convictions if the circuit court properly exercised its discretion, regardless of whether we would have made the same ruling." *Id.*

¶49 "[N]ot all of a witness's convictions are admissible to attack his or her credibility. Rather, the [circuit] court has significant discretion to balance the various interests set out in" WIS. STAT. § 906.09. *State v. Lobermeier*, 2012 WI App 77, ¶17, 343 Wis. 2d 456, 821 N.W.2d 400.[7] The factors that a court may

---

[7] In his reply brief, Kellogg notes that the State cites *State v. Lobermeier*, 2012 WI App 77, 343 Wis. 2d 456, 821 N.W.2d 400, but he argues that the "case is easily distinguishable." As we have done here, the State cites *Lobermeier* for a general proposition related to our standard of review, which is entirely unrelated to, and not based on, the specific facts of the case.

consider to determine whether to admit or exclude prior conviction evidence include the following: (1) "[t]he lapse of time since the conviction"; (2) "[t]he rehabilitation or pardon of the person convicted"; (3) "[t]he gravity of the crime"; (4) "[t]he involvement of dishonesty or false statement in the crime"; (5) "[t]he frequency of the convictions"; and (6) "[a]ny other relevant factors." Sec. 906.09(2)(a)-(f). "These factors are weighed in a balancing test to determine whether the probative value of the prior conviction evidence 'is substantially outweighed by the danger of unfair prejudice.'" *Smith*, 203 Wis. 2d at 296 (quoting § 906.09(2)).

¶50 Kellogg challenges the circuit court's decision on the grounds that the court "did not fully evaluate the factors set out in WIS. STAT. § 906.09 and did not weigh probative value versus prejudice as it should have." According to Kellogg, the court erred by "relying just on the age of the convictions" because "Wisconsin does not bar prior convictions just because they are old like federal courts do." *See Gary M.B.*, 270 Wis. 2d 62, ¶23 (discussing federal rule barring convictions more than ten years old). Further, Kellogg notes that "[t]he case for counting the convictions is made even stronger because some of the more recent prior convictions were for crimes of dishonesty," which is a factor under § 906.09. Finally, Kellogg asserts that the court "never stated it was excluding seven of [Esther's] eight prior convictions because it worried about their prejudicial effect."

¶51 Our resolution of this issue rests entirely on the application of our standard of review, and we conclude that the circuit court appropriately exercised its discretion by limiting mention of Esther's prior convictions to one. Kellogg's arguments on appeal are entirely based on the fact that all of Esther's prior convictions were *presumed admissible* under WIS. STAT. § 906.09, which is correct, *see Gary M.B.*, 270 Wis. 2d 62, ¶22, but his arguments appear to suggest

22

that the court was then *required* to admit all of Esther's prior convictions, which is not correct. Kellogg presents no legal authority to the contrary. We conclude that Kellogg merely disagrees with the weight the court gave to the factors it considered and its application of the balancing test, which cannot serve as a basis for us to overturn the court's discretionary decision.

¶52 This trial occurred in 2022. At that time, Esther had eight misdemeanor and felony convictions and juvenile adjudications, which occurred from 2003 to 2012. Kellogg's defense counsel argued that all of Esther's convictions should be counted, except for the 2003 juvenile adjudication. Counsel did not offer any argument before the circuit court to support that request.

¶53 In contrast, the State argued that because most of Esther's convictions were over 10 years old, only the most recent 2012 conviction should be counted. The State also noted that the jury would hear that Esther was incarcerated when Nicola was born, so it was reasonable for the jury to be told about that conviction. Further, the State argued to the circuit court that Esther was "very young" when she committed her other offenses—explaining in its brief that Esther was 12 and 16 years old at the time of her juvenile adjudications, her 2012 conviction was when she was 20 or 21 years old, and she was 31 years old at the time of the trial in this case. The State also informed the court that Esther was preparing paperwork to seek a pardon for her prior convictions.

¶54 The circuit court ultimately agreed with the State, concluding that Esther could be asked about prior convictions and that she should answer "one," in reference to the 2012 conviction for misappropriation of identification because the remaining offenses were too remote in time. In reaching this conclusion, the court also considered the prior convictions of the other witnesses, including Kellogg,

and sought to reach consistent rulings, ultimately refusing to allow any other witness to be questioned about prior convictions because those convictions were also too remote. The court weighed the lapse of time since Esther's convictions and her rehabilitation the most heavily, though it also appeared to consider the frequency of Esther's convictions at the time she was committing them. Thus, the court considered proper factors under WIS. STAT. § 906.09(2) and used a rational process to reach a reasonable conclusion. Although the court's decision was not the one advocated by Kellogg, that fact does not demonstrate an erroneous exercise of discretion. *See Gary M.B.*, 270 Wis. 2d 62, ¶19.

¶55　Kellogg argues that a circuit court is required to address or evaluate *all* the factors in WIS. STAT. § 906.09, but he presents no authority in support of that proposition. Instead, case law explains that "we will not find error predicated upon the circuit court's failure to address factors not brought to its attention by defense counsel." *Gary M.B.*, 270 Wis. 2d 62, ¶30. Before the circuit court, Kellogg's defense counsel generally referenced "the factors in [§] 906.09," but he failed to make an argument regarding any specific factor, mentioning only that the 2003 juvenile case "would not have to [be] include[d]." Kellogg cannot now assert circuit court error based on arguments defense counsel failed to offer. *See Gary M.B.*, 270 Wis. 2d 62, ¶30 ("[T]he onus is on defense counsel to articulate the relevant balancing test factors and discuss why the probative value of the particular convictions is substantially outweighed by the danger of unfair prejudice.").[8]

---

[8] For this reason, the State notes that Kellogg's arguments are only reviewable under a claim of ineffective assistance of counsel, which he has not preserved. *See State v. Gary M.B.*, 2004 WI 33, ¶27, 270 Wis. 2d 62, 676 N.W.2d 475.

¶56   Kellogg nevertheless complains that "the record is so lacking in terms of the required analysis." While the circuit court's reasoning was brief, we need not accept that fact as a failure to exercise its discretion. *See id.*, ¶26. Instead, "if a circuit court does not explicitly engage in balancing on the record, an appellate court can nevertheless affirm, if the record indicates that balancing is implicit from the circuit court's determination." *Id.*

¶57   Here, the circuit court's "decision exhibits implicit agreement" with the State's reasoning that 7 of the convictions should be excluded because they occurred over 10 years before trial, Esther was under 21 when she committed those crimes, she had not reoffended in the past decade, and she was preparing to seek a pardon for her prior convictions. *See id.*, ¶27. The court need not use "magic words" to demonstrate that it engaged in a balancing of the probative value of the prior convictions against the danger of unfair prejudice. *See id.*, ¶26 (citation omitted). The court's decision further demonstrates that it employed balancing because it considered whether its ruling on Esther's prior convictions was consistent with its rulings on the other witnesses' prior convictions. Therefore, Kellogg cannot demonstrate that the circuit court's ruling limiting Esther's past convictions under WIS. STAT. § 906.09 was an erroneous exercise of discretion.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.